STATE OF NORTH CAROLINA v. DOCK McKOY, JR., A/K/A DOCK McCOY, A/K/A DOCK McKAY, A/K/A PAUL McCOY

No. 585A85

(Filed 7 September 1988)

1. **Criminal Law §§ 102.13, 120.1— capital case—comments by trial court and prosecutor on appellate review**

    The trial court's statement during a routine explanation of the court reporter's duties that "the Supreme Court can review" this case, and the prosecutor's jury argument that defendant, if convicted, can appeal questions of law but not the jury's findings of fact, could not reasonably be construed to diminish the jury's responsibility for its decisions and thus did not fatally undermine the jury's verdict of guilty of first degree murder and its conclusion that death is the appropriate punishment.

2. **Jury § 6.3— voir dire of prospective jurors—sympathy toward intoxicated defendant**

    The trial court did not abuse its discretion by failing *ex mero motu* to prohibit the prosecutor in a first degree murder case from asking several prospective jurors whether they would be sympathetic toward a defendant who was intoxicated at the time of the offense, since the questions did not tend to "stake out" the jurors as to their potential verdict or how they would vote under a given state of facts but were properly allowed in the exercise of the prosecutor's right to secure an unbiased jury.

3. **Criminal Law § 75.10— refusal to sign written waiver of rights—oral waiver**

    The trial court's finding that defendant made an express waiver of his rights before interrogation was supported by an S.B.I. agent's testimony that defendant refused to sign a written waiver because he could not see it but stated that he understood his rights and agreed to talk with the officers.

1

**4. Criminal Law § 75.8— no expressed desire to terminate interview — supporting evidence**

The trial court's finding that defendant never expressed a desire to terminate an interview was supported by an S.B.I. agent's testimony that defendant asked to take a break because he was tired and that defendant subsequently agreed to resume the conversation.

**5. Criminal Law § 75— voluntariness of confession and waiver of rights—totality of circumstances—necessity for police coercion**

The appellate court will look to the totality of circumstances in determining the voluntariness of a confession and the waiver of *Miranda* rights. However, police coercion is a necessary predicate to a determination that a waiver or statement was not given voluntarily within the meaning of the due process clause of the Fourteenth Amendment.

**6. Criminal Law § 75.10— voluntariness of waiver of rights and confession—previous convictions**

A finding that defendant had previously been convicted of two felonies and that he told an officer that, because of this experience, he understood "all that stuff" (*i.e.*, his rights) supported the conclusion that defendant's waiver of his rights and his confession were voluntary.

**7. Criminal Law § 75.15— voluntariness of confession—mild intoxication**

The fact that defendant may have experienced some lingering, mild intoxication at the time of his confession does not preclude the conclusion that he confessed voluntarily. Rather, defendant's intoxication was relevant to his credibility, which was a question for the jury.

**8. Criminal Law § 75.14— low I.Q.—voluntariness of confession**

Although a psychiatrist testified that defendant's I.Q. placed him in the borderline range of intellectual functioning, the evidence permitted a conclusion that defendant had sufficient mental capacity to waive his rights and voluntarily confess where it showed that defendant spoke rationally during his extensive conversation with officers; he held a job prior to the shooting in question and was described by his supervisor as a good worker; and he had the mental capacity to testify at trial.

**9. Criminal Law § 75.14— mental disorders—voluntariness of confession—conflicting psychiatric and lay testimony**

A psychiatrist's testimony that defendant's mental disorders would prevent him from making a truly voluntary confession did not preclude a conclusion that defendant's mental disorders did not prevent his making a voluntary confession where an S.B.I. agent, who had ample opportunity to observe defendant at the time he waived his rights and confessed, gave substantial testimony indicating that defendant was able to comprehend his discussion with law officers.

**10. Criminal Law § 75.10— voluntariness of waiver of rights and confession—totality of circumstances**

The totality of the circumstances permitted the trial court's conclusion that defendant knowingly, intelligently, and voluntarily waived his *Miranda*

rights and that his in-custody statements were made freely, understandingly, and voluntarily.

**11. Criminal Law § 102.7— jury argument concerning psychiatrist—absence of prejudice**

The trial court did not abuse its discretion in overruling defendant's objection to the prosecutor's potentially misleading jury argument in a first degree murder case that "if the law recognized them [psychiatrists] as the experts on what the condition of somebody's mind was, you wouldn't be hearing the case" where the prosecutor went on to state correctly that the law permits hearing from the experts and considering what they have to say, and he then urged the jurors to consider not only the expert testimony but also that of the other witnesses.

**12. Criminal Law § 102.6— jury argument—competency to stand trial as evidence of sanity**

The trial court did not abuse its discretion in overruling defendant's objection to the prosecutor's jury argument suggesting that the fact that defendant was competent to stand trial indicated that his sanity defense lacked merit since the argument did not misstate the law but in effect urged the jury to consider evidence of defendant's state of mind at the time of trial in passing upon his state of mind at the time of the crime, and since the trial court gave clear and correct instructions on insanity.

**13. Criminal Law § 102.6— jury argument—misstatement of law as one interpretation—objection sustained**

The trial court did not abuse its discretion in sustaining the State's objection to defense counsel's jury argument that, in order to convict defendant of first degree murder, the jury would have to find that a psychiatrist who testified that defendant lacked the mental capacity to premeditate and deliberate at the time of the crime "was wrong about it beyond a reasonable doubt," since the argument could have been interpreted as stating the correct proposition that the State bore the burden of proving beyond a reasonable doubt the premeditation and deliberation element of first degree murder or as incorrectly implying that the State bore the burden of proving the insanity defense. Assuming error, defendant failed to carry his burden of showing prejudice where the trial court's charge correctly and unambiguously emphasized the State's burden of proving premeditation and deliberation beyond a reasonable doubt.

**14. Criminal Law § 135.9— emotional disturbance mitigating circumstance—jury's failure to find—defendant's expert testimony not uncontradicted or inherently credible**

The testimony of defendant's two psychiatric experts that defendant was suffering from significant psychological disorders at the time of a shooting was neither uncontradicted nor inherently credible so as to make the sentencing determination unreliable because of the jury's failure to find the statutory mitigating circumstance that "defendant was under the influence of mental or emotional disturbance" where the testimony of other witnesses regarding defendant's mental and emotional state at the time of the shooting conflicted

State v. McKoy

with that of defendant's experts, and where neither of defendant's experts examined him until several weeks or months after the crime. N.C.G.S. § 15A-2000(f)(2) (1983); Eighth and Fourteenth Amendments to the U. S. Constitution.

**15. Criminal Law § 102.6— jury argument—commitment not to sympathize with intoxicated defendant**

The trial court in a first degree murder case did not abuse its discretion by failing to intervene *ex mero motu* when the district attorney reminded the jurors during his closing argument of their commitments not to have sympathy for defendant because he was intoxicated.

**16. Criminal Law § 135.9— capital sentencing procedure—mitigating circumstances—requirement of jury unanimity—constitutionality**

The trial court's sentencing instructions in a first degree murder case were not erroneous and unconstitutional under the decision of *Mills v. Maryland*, 486 U.S. --- (100 L.Ed. 2d 384) because they required jury unanimity on the existence of a mitigating circumstance before that circumstance could be considered for the purpose of sentencing.

**17. Criminal Law § 135.4— capital sentencing procedure—individualized sentencing and guided sentencer discretion—constitutionality**

The North Carolina capital sentencing procedure allows for individualized sentencing by (1) allowing the jury to find circumstances in mitigation, both submitted circumstances and any other circumstances the jury deems to have mitigating value, (2) allowing the jury to consider all relevant evidence in deciding whether to recommend a sentence of death, and (3) requiring the jury, before recommending that defendant be sentenced to death, to weigh the "found" aggravating and "found" mitigating circumstances and to decide whether the "found" aggravating circumstances, considered with the "found" mitigating circumstances, are sufficiently substantial to call for the death penalty. The capital sentencing procedure also guides the jury's discretion so as to guard against the arbitrary and capricious infliction of the death penalty by (1) requiring the State to prove the existence of an aggravating circumstance beyond a reasonable doubt, (2) requiring the defendant to prove the existence of a mitigating circumstance by a preponderance of the evidence, and (3) then allowing the jury to consider only that evidence which is relevant, *i.e.*, the evidence which the jury had unanimously "found," in sentencing the defendant. The capital sentencing procedure thus provides a proper balance between individualized sentencing and guided discretion in conformity with federal constitutional requirements.

**18. Criminal Law § 135.8— capital case—aggravating factors relied on—no right to disclosure**

The trial court in a capital case did not err in denying defendant's motion to require the State to disclose potential aggravating circumstances it intended to rely upon at sentencing.

State v. McKoy

**19. Criminal Law § 135.9— capital case—mitigating circumstances—burden of proof**

   The trial court in a capital case did not err in placing the burden of proving the existence of mitigating circumstances on defendant rather than on the State.

**20. Criminal Law § 135.7— capital case—affirmative answer to issue four—death penalty required**

   The trial court did not err in instructing the jury in a capital case that it must recommend a death sentence if it answered issue four affirmatively.

**21. Criminal Law § 135.8— prior violent felony aggravating circumstance—constitutionality**

   The aggravating circumstance that defendant had a prior conviction of a felony involving the use or threat of violence to the person is not unconstitutionally vague and overbroad either facially or as applied in this case.

**22. Criminal Law § 135.10— first degree murder—death penalty not disproportionate**

   A sentence of death imposed upon defendant for first degree murder was not disproportionate or excessive, considering both the crime and the defendant, where the crime was committed against a law officer while he was engaged in his official duties; the killing followed a considerable period during which law officers and a neighbor attempted to persuade defendant to stop randomly shooting his gun and after defendant told the officer to "leave or I'll kill you"; and the jury found that defendant had previously been convicted of a felony involving the use of violence to the person in that he had pled guilty to second degree murder.

   Chief Justice Exum dissenting.

   Justice Frye joins in this dissenting opinion.

   Justice Frye dissenting.

   Chief Justice Exum joins in this dissenting opinion.

   Justice Martin dissenting in part.

   Chief Justice Exum and Justice Frye join in this dissenting opinion.

   APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a death sentence entered by *Freeman, J.,* at the 29 July 1985 session of Superior Court, STANLY County. Heard in the Supreme Court 14 March 1988; additional arguments heard 22 August 1988.

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Assistant Attorney General, for the State (original brief and argument); Lacy H. Thornburg, Attorney General, James J. Coman, Senior Deputy Attorney General, William N. Farrell, Jr., Special Deputy Attorney General, Joan H. Byers, Special Deputy Attorney General, Steven F. Bryant, Assistant Attorney General, and Barry S. McNeill, Assistant Attorney General, for the State (supplemental brief and argument).*

*Malcolm Ray Hunter, Jr., Appellate Defender, by David W. Dorey, Assistant Appellate Defender, for defendant-appellant (original brief and argument); Malcolm Ray Hunter, Jr., Appellate Defender, and Louis D. Bilionis, for defendant-appellant (supplemental brief and argument).*

*E. Ann Christian and Robert E. Zaytoun for North Carolina Academy of Trial Lawyers, amicus curiae.*

*John A. Dusenbury, Jr., for North Carolina Association of Black Lawyers, amicus curiae.*

WHICHARD, Justice.

Defendant was convicted of the first degree murder of Deputy William Kress Horne of the Anson County Sheriff's Department. The jury found as aggravating circumstances that defendant previously had been convicted of a felony involving violence and that the murder was committed against a deputy sheriff while engaged in the performance of official duties. It found as mitigating circumstances that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired and that defendant has borderline intellectual functioning.

The jury recommended the death penalty, and the trial court sentenced accordingly. We find no error.

Haywood Haskell lived beside defendant outside of Wadesboro. On 22 December 1984, Haskell was working on his wife's car. He observed defendant fire two shots into the air. Haskell suggested that defendant's shooting could endanger the neighborhood children, but defendant responded that "everybody else is shooting" and "well, it's Christmas."

Haskell telephoned the Anson County Sheriff's Department, and Deputy Calvin Lambert responded. After discussing the situation with Haskell, Lambert walked onto defendant's porch and attempted to talk with him. Lambert asked defendant to step out onto the porch, but defendant remained inside. Lambert told defendant not to shoot his gun because he was drunk and might hurt someone. He then returned to his car and observed defendant's home for several minutes before leaving the area.

Later, Haskell saw defendant lying in front of his outhouse. Because defendant could not stand unaided, a neighbor helped him to his house. Defendant had locked himself out, and the neighbor helped him gain entry by prying open a window. A few minutes later defendant hailed Duke Cox, a neighborhood teenager, and asked Cox to help him fix the window. Cox attempted to help, but he soon left because defendant refused to provide a hammer. When Cox walked away, defendant accused him of stealing some money and fired three shots in his direction.

Prompted by this incident, Haskell again called the sheriff's department. Deputies Robert Usery and Kress Horne responded. They asked defendant to come outside; defendant responded by threatening to kill them if they did not leave. More officers arrived, and Usery decided to investigate in back of defendant's house while Horne stood behind the patrol car and continued to talk to defendant. While Usery circled behind defendant's house, Horne drew his revolver and braced himself across the patrol car. Defendant pushed open his screen door and fired one shot that hit Horne in the face. Horne later died from the resultant injuries.

The other officers surrounded the house, and Usery advised defendant that he would use tear gas if defendant did not come out. Hearing no response, Usery threw a tear gas canister into the house. After defendant fired two shots, the officers returned a short burst of fire. Defendant then walked out, and the officers took him into custody. Because defendant was bleeding from two wounds, the officers transported him to the Anson County Hospital.

There, Dr. Merceda Perry examined defendant. Perry found two bullet wounds, and he noticed a strong odor of alcohol. He treated a puncture wound on defendant's buttocks and a deep laceration on his forehead, which he closed with sutures. Initially,

Perry found that defendant responded incoherently to his questions. At approximately 6:30 p.m., Perry ordered a blood alcohol test which indicated that defendant's blood alcohol level was equivalent to a .26 reading on the breathalyzer scale. Although defendant remained intoxicated, he had become more coherent by 7:20 p.m., the last time Perry saw him. In Perry's opinion, defendant would have become more coherent still by 8:30 p.m. At 8:15 p.m., Perry released defendant into the custody of S.B.I. Agent Carl Jackson for delivery to Central Prison in Raleigh.

Jackson and two deputy sheriffs placed defendant in a van and drove him to the sheriff's department, where warrants were served on him. They then drove toward Raleigh. When defendant complained that he was thirsty, the officers purchased two soft drinks, which defendant consumed. Jackson read defendant his rights, and defendant orally agreed to waive them. Defendant refused to sign a written waiver because his head injury prevented him from seeing the waiver form. Defendant made several statements during the trip admitting that he killed Deputy Horne because Horne "pressured" him.

GUILT PHASE

[1] Defendant contends that the jury's verdict of guilt, and its conclusion that death is the appropriate punishment, are "fatally undermined" by the fact that both the trial court and the prosecutor informed the jury that the trial was subject to appellate review. The factual basis of the argument is as follows:

First, at the outset of the trial the court identified the court reporter to the jurors and explained:

The lady right down here in front of me in the blue dress is Melody Courtney. She's a court reporter. She will be taking down everything that's said or done during the trial so that everything is a matter of public record and then she can type up a transcript of a trial and they mail it down to the Supreme Court and the Supreme Court can review what we're doing up here in Stanly County.

Defendant did not object to this statement, and the court continued its general explanation of the duties of various court personnel.

Second, in his closing guilt-phase argument, the prosecutor stated the following:

> And you may say, well, what is our role? Now, the Judge will tell you what your role as a trial juror happens to be. As we understand your role, you are the finders of fact, simply that. You don't decide what the law is. You don't interpret the law. The law is given to you by the Judge and he tells you what the meaning of that law is, and he will tell you how you — he will tell you how to apply that law which he gives to you to the facts that you have found from the sworn testimony.
>
> The jury is simply a fact — a body that finds facts. That's all you're here for. There is no appeal in your finding of facts. There is a right of appeal to any interpretation of laws and application of laws which are present in this case. The defendant, if convicted, as we say he certainly should be from the evidence and under the law, he can appeal on points of law, —

MR. STOKES: OBJECTION.

MR. LOWDER:  — questions of law, —

THE COURT: OVERRULED.

MR. LOWDER:  — but he cannot appeal from your findings of fact.

The legal basis of defendant's argument is grounded, essentially, in this Court's decisions in *State v. White*, 286 N.C. 395, 211 S.E. 2d 445 (1975), and *State v. Jones*, 296 N.C. 495, 251 S.E. 2d 425 (1979), and in the United States Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320, 86 L.Ed. 2d 231 (1985). The pertinent aspects of these cases are as follows:

In *White*, the prosecutor argued:

"[Y]ou will answer the question whether this defendant is guilty of first degree murder. If found guilty, he gets an automatic appeal to the Supreme Court of North Carolina — it is necessary. If any error is made in this court, that Court will say."

*White*, 286 N.C. at 402, 211 S.E. 2d at 449. The trial court sustained defendant's objection and instructed the jury: "[D]on't consider what he said about the Supreme Court." Later, as it began its charge, the court gave the following instruction:

> "I want to go back to the argument that was objected to in the argument of counsel that the Supreme Court has a right to send this case back on mistakes. The reason I sustained that objection, I want you all to understand is that the Supreme Court will review this case. That they would only send the case back if I make a mistake on a legal question. They will not review the decisions of the facts by the jury. The jury is the sole trier of the facts of this lawsuit."

*Id.* at 402-03, 211 S.E. 2d at 449. We explained that an argument suggesting that the jury can "depend upon either judicial or executive review to correct any errors in their verdict, and to share their responsibility for it, is an abuse of privilege and prejudicial to the defendant." *Id.* at 403, 211 S.E. 2d at 450. The prosecutor's argument, we said, "was clearly intended to overcome the jurors' natural reluctance to render a verdict of guilty of murder in the first degree by diluting their responsibility for its consequences." *Id.* at 404, 211 S.E. 2d at 450. While the court accurately stated that this Court will only review questions of law, the instructions were nonetheless held inadequate to cure the impropriety because they "did not fully enlighten the jury as to the nature of the Supreme Court's review of a case on appeal and as to the difference between 'triers of the facts' and judges of the law." *Id.* Moreover, we said, the jury probably understood the statement that "the Supreme Court will review this case" to mean that the trial court assumed that there would be a guilty verdict. *Id.* at 404, 211 S.E. 2d at 450-51. For these reasons, we granted the defendant a new trial. *Id.* at 404, 211 S.E. 2d at 451.

In *Jones*, the prosecutor argued: "[I]f you do err in this case he [defendant] has the right of appeal." *Jones*, 296 N.C. at 497, 251 S.E. 2d at 427. Because an appellate court will not review the factfinder's verdict in the guilt phase, we observed that the prosecutor had made an inaccurate statement. Moreover, the argument's "overriding vice" was that it "effectively told the jurors that they could rely upon the Supreme Court to correct their verdict if it were wrongful or improper . . . ." *Id.* at 500, 251 S.E. 2d

at 428. We held that the argument could have caused the jury to believe that this Court would share its burden of reaching a verdict, and we thus granted defendant's request for a new trial. *Id.*

In *Caldwell*, the prosecutor argued to the jury: "[Y]our decision is not the final decision. . . . Your job is reviewable." *Caldwell*, 472 U.S. at 325, 86 L.Ed. 2d at 237. In addition, the trial court stated that the jury's decision would be "reviewable automatically as the death penalty commands." *Id.* The United States Supreme Court vacated defendant's death sentence, stating that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328-29, 86 L.Ed. 2d at 239.

These cases stand for the proposition that statements by the trial court or prosecutor that tend to dilute the jury's sense of responsibility for its determinations by suggesting that its verdict will be reviewed, or that the punishment imposed will be withheld, are impermissible and prejudicial. *See* 75 Am. Jur. 2d *Trial* § 230 (1974) ("[c]omments . . . on the power of the court to suspend sentence or to set the jury's verdict aside, or statements that a higher court has the power to review the finding of the jury on the weight of the evidence, are calculated to induce the jury to disregard their responsibility, and are improper."). That proposition is not implicated, however, by the facts here, which are distinguishable from those in the above cases.

In *White*, the prosecutor told the jury that "[if] any error is made *in this court*, [the Supreme] Court will say." *White*, 286 N.C. at 402, 211 S.E. 2d at 449 (emphasis added). The jury clearly could have interpreted the phrase "in this court" to include its errors as well as the court's errors. Here, by contrast, the prosecutor clearly stated that defendant could not appeal from the jury's findings of, fact.

Further, in *White* the court stated to the jury that "the Supreme Court *will* review this case." *Id.* at 402, 211 S.E. 2d at 449 (emphasis added). This Court concluded that by that "positive statement . . . the jury was bound to have understood that the court assumed [that] their verdict would be guilty." *Id.* at 404, 211 S.E. 2d at 450-51. Here, by contrast, the court only noted the pos-

sibility of appeal by stating — in the context of a routine explanation of the court reporter's duties — that "the Supreme Court *can* review" this case. (Emphasis added.) This statement implies no assumption of guilt and only conveys information commonly known. We conclude that this brief comment — at the outset of the trial and in the context of an explanation of the court reporter's duties — could not have influenced, adversely to defendant, the jury's perception of its responsibility for its decisions.

Likewise, in *Jones*, the prosecutor argued to the jury: "[I]f *you* do err in this case he [defendant] has the right of appeal." *Jones*, 296 N.C. at 497, 251 S.E. 2d at 427 (emphasis added). Here, as noted above, the prosecutor instead clearly stated that defendant could not appeal from the jury's findings of fact. The challenged argument was simply an explanation of the jury's function and of the application of the law to the facts.

Finally, in *Caldwell* the prosecutor argued to the jury: "[Y]our decision is not the final decision. . . . Your job is reviewable. . . . [T]he decision you render is automatically reviewable by the Supreme Court." *Caldwell*, 472 U.S. at 325-26, 86 L.Ed. 2d at 237. As noted above, the United States Supreme Court vacated the death sentence on the ground that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29, 86 L.Ed. 2d at 239. It stated: "[T]he uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." *Id.* at 333, 86 L.Ed. 2d at 242.

Again, unlike in *Caldwell*, the prosecutor here did not argue that the jury's determination of defendant's guilt and punishment was not final. Instead, he clearly informed the jury that there was no appeal from its findings of fact. The risk condemned in *Caldwell*, *viz*, "state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court," *id.* at 330, 86 L.Ed. 2d at 240, thus is not present here.

For the foregoing reasons, we do not find *White, Jones*, and *Caldwell* controlling. Instead, we conclude that this case is more

like *State v. Finch*, 293 N.C. 132, 235 S.E. 2d 819 (1977). The trial court in *Finch* remarked: "[T]ake what the court says about the law, and what it is in the case. *If the Court is wrong, then the Court of Appeals will let that be known. Somebody will straighten that out, but you take your instructions from the Court."* *Id.* at 135, 235 S.E. 2d at 821 (emphasis in original). We held that these statements did not suggest that the verdict would be reviewed or that the mandated punishment would be withheld; they simply informed the jury that the law, as stated by the trial court, could be reviewed. *Id.* at 137, 235 S.E. 2d at 822.

Here, as in *Finch*, nothing in the statements by the court or the prosecutor could reasonably be construed to diminish the jury's responsibility for its decisions. The trial court only informed the jury that this Court "*can* review" the case. (Emphasis added.) "Mere reference to the process of appellate review does not invalidate a death sentence." *Mazzan v. State*, 733 P. 2d 850, 851 (Nev. 1987). Viewed in context, the prosecutor's argument stressed the jury's role as the final factfinder rather than diluting its sense of responsibility for its verdict. *See id.* at 851 ("argument did not shift responsibility to the appellate court, but rather heightened the sentencing jury's awareness of the gravity of its task"); *Riley v. State*, 496 A. 2d 997, 1025 (Del. 1985), *cert. denied*, 478 U.S. 1022, 92 L.Ed. 2d 743 (1986) ("In no sense may it reasonably be said that the prosecutor was either misstating the law, misleading the jury as to its role, or minimizing its sentencing responsibility."). We thus conclude that the trial court did not abuse its discretion by allowing the argument. *State v. Huffstetler*, 312 N.C. 92, 111, 322 S.E. 2d 110, 122 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985). These assignments of error are overruled.

[2] Defendant next contends that the trial court erred by allowing the prosecutor, during voir dire, to "stake out" the jurors by obtaining commitments from them to disregard defendant's intoxication in determining the existence of premeditation and deliberation and to reject his voluntary intoxication defense. Defendant failed to object to the prosecutor's questions at trial. Ordinarily, such failure constitutes a waiver of the right to assert the alleged error on appeal. *State v. Oliver*, 309 N.C. 326, 334, 307 S.E. 2d 304, 311 (1983). However, in light of our practice of scrupulous review in death sentence cases "to the end [that] it

may affirmatively appear that all proper safeguards" have been afforded the defendant, *State v. Whitley,* 288 N.C. 106, 108, 215 S.E. 2d 568, 570 (1975) (quoting *State v. Fowler,* 270 N.C. 468, 469, 155 S.E. 2d 83, 84 (1967)), we elect to review the issue.

The prosecutor asked several prospective jurors whether they would be sympathetic toward a defendant who was intoxicated at the time of the offense. The questions varied slightly, but the thrust of each was:

> If it is shown to you from the evidence and beyond a reasonable doubt that defendant was intoxicated at the time of the alleged shooting, would this cause you to have sympathy for him and allow that sympathy to [a]ffect your verdict?

Each juror responded negatively to the question.

Counsel is allowed wide latitude in examining jurors on voir dire; regulation of the form of the questions lies within the trial court's discretion. *State v. Vinson,* 287 N.C. 326, 336, 215 S.E. 2d 60, 68 (1975), *modified as to death penalty,* 428 U.S. 902, 49 L.Ed. 2d 1206 (1976). A defendant seeking to establish reversible error must demonstrate prejudice as well as a clear abuse of that discretion. *State v. Avery,* 315 N.C. 1, 20, 337 S.E. 2d 786, 797 (1985).

In *Vinson,* we explained:

> [H]ypothetical questions so phrased as to be ambiguous and confusing or containing incorrect or inadequate statements of the law are improper and should not be allowed. Counsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts. . . . The court should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts.
>
> Types of questions which have been considered improper include "those asking a juror what his verdict would be if the evidence were evenly balanced; if he had a reasonable doubt of a defendant's guilt; if he were convinced beyond a reasonable doubt of a defendant's guilt; or questions asking him

whether he would, in a specified hypothetical situation, vote in favor of the death penalty. . . ."

*Vinson*, 287 N.C. at 336-37, 215 S.E. 2d at 68 (citations omitted); *accord State v. Avery*, 315 N.C. at 20, 337 S.E. 2d at 797.

The questions here were properly allowed as an inquiry into the jurors' sympathies toward an intoxicated person. They did not contain incorrect or inadequate statements of law, nor were they ambiguous or confusing. Moreover, they did not tend to "stake out" the jurors as to their potential verdict or how they would vote under a given state of facts. The questions did not "fish for answers to legal questions before the judge ha[d] instructed the jury." *State v. Clark*, 319 N.C. 215, 221, 353 S.E. 2d 205, 208 (1987).

Addressing the propriety of similar questions, our Court of Appeals has upheld the State's questioning prospective jurors as to whether they could be fair and impartial in a case involving a proposed sale of marijuana. *State v. Williams*, 41 N.C. App. 287, 254 S.E. 2d 649, *disc. rev. denied*, 297 N.C. 699, 259 S.E. 2d 297 (1979). It held that the State's questions tended only to "secure impartial jurors," while not causing them to commit to a future course of action. *Id.* at 291-92, 254 S.E. 2d at 653.

As in *Williams*, the prosecutor here was simply inquiring into the sympathies of prospective jurors in the exercise of his right to secure an unbiased jury. *See State v. Lee*, 292 N.C. 617, 621, 234 S.E. 2d 574, 577 (1977) (State entitled to unbiased jury; primary purpose of voir dire is to secure such). A promise not to sympathize with a defendant because of his intoxication is not the equivalent of a commitment to ignore the effect of intoxication in the resolution of legal issues. The questions and responses did not "stake out" the jurors to disregard the trial court's instructions on the effect of intoxication in determining defendant's guilt or innocence, or his sentence, under the law applicable to the facts presented. We thus hold that the trial court did not abuse its discretion by failing *ex mero motu* to prohibit this line of questioning. *See State v. Clark*, 319 N.C. 215, 353 S.E. 2d 205 (proper for prosecutor to ask prospective jurors if the fact that the State was relying on circumstantial evidence would cause them any problems); *State v. Hedgepeth*, 66 N.C. App. 390, 310 S.E. 2d 920 (1984) (proper for defense counsel to ask prospective jurors if they

could follow instructions to consider defendant's criminal record only in determining his credibility).

Defendant next assigns error to the trial court's refusal to suppress evidence of his inculpatory post-arrest statements. He argues that he did not make a voluntary waiver of his *Miranda* rights and did not make his statements voluntarily.

After a voir dire hearing to determine the admissibility of defendant's statements, the trial court made findings of fact and conclusions of law, in pertinent part, as follows:

[T]hat the defendant was arrested at the scene of the crime . . . [at] approximately six o'clock p.m. on December the 22nd, 1984; that he was charged with assault with a deadly weapon with intent to kill, three counts; that he was thereafter taken to the Anson County Hospital and treated for a wound to his head and to his buttocks; and that he was thereafter taken by van to . . . Central Prison for safekeeping; . . . that he was interrogated in the van enroute . . . ; that the temperature and conditions inside the van were comfortable; . . . ; that prior to any question or interrogation the defendant was advised of his constitutional rights . . . ; that these rights were read to him; that he was advised of his rights at approximately 8:43 p.m., advised of his right to remain silent and [that] anything he said would be used against him as evidence in court, and advised of [his] right to have an attorney present before and during any questioning; that he was advised of a right to have an attorney appointed, if he couldn't afford one, the State . . . would appoint him one; that he was advised of his right to . . . stop answering questions at any time and not to resume until he had an attorney present if he wanted one; that he was advised of these rights by Special Agent Carl Jackson . . . of the [S.B.I.]; . . . that [Jackson] . . . was introduced as a law enforcement officer; and that he was also advised of his rights in the presence of Henry Watkins . . . and George Pratt . . . [;] . . . that the defendant replied orally in English that he understood all of this stuff, that he had been tried for his life in 1951, and that he had heard all of this stuff before, and that he understood his rights; that he stated that he did not want a lawyer present and that he stated that he would talk, but that he didn't

want to sign anything because he could not see[;] . . . that he was interrogated in English by [Jackson] and at a later point questions were asked by [Watkins] and Pratt[;] . . . that the defendant is approximately sixty-five years old and he speaks and understands English[;] . . . that his educational background is very limited, that he has an I.Q. of approximately—between 74 and 89[;] . . . that his physical condition at the time of the interrogation was that he had been released from the hospital, that he had been treated for an injury to his eye; that his left eye was swollen shut; that he was blind in his right eye; that he had an injury to his hip from a gunshot wound; that both of these wounds had been treated by a physician at the Anson County Hospital; that he was in good condition otherwise; that he was sitting up and that other than the bandage he appeared basically [in] the same condition as he does in court today; that at one point . . . the defendant requested something to drink and . . . was provided with two soft drinks, which he consumed[;] . . . that the defendant had a slight to moderate odor of alcohol about his person and that at the time of the interrogation at 8:43 and thereafter that he was not under the influence of alcohol or drugs[;] . . . that the defendant was coherent, that he was understanding and that he was not confused and not complaining[;] . . . that the answers in relation to the questions asked were extremely reasonable, responsive and appropriate[;] . . . that no promises, offers of reward or inducement[s] by any law enforcement officers were made in order for the defendant to make a statement[;] . . . that there were no threats or suggest[ions] of violence or show of violence by any law enforcement officers made to persuade or induce the defendant to make a statement[;] . . . that the defendant made no statement desiring to stop the questions, but at one point he did request to be allowed to rest, and that he was allowed to rest for approximately seventeen minutes[;] . . . that the defendant made no request for an attorney during any of the questioning, and that the defendant expressly stated he did not want an attorney present; that the defendant . . . expressly stated that he did understand his rights; that he was unable to sign the written waiver, but that he did, in fact, make an expressed oral waiver to [Jackson]. And based on these findings of fact the Court would conclude as a

matter of law that under the totality of the circumstances none of the constitutional rights, neither Federal nor State, of the defendant were violated by his arrest, detention, interrogation, or confession; that there were no promises, offers of reward, or inducement[s] to the defendant to make a statement; that there were no threat[s] or suggest[ions] of violence or show of violence to persuade or induce the defendant to make a statement; that the statements made by the defendant to [Jackson] . . . were made freely, voluntarily and understandingly; that the defendant was in full understanding of his constitutional rights to remain silent, of his right to counsel, and all other rights; and that he freely, knowingly, intelligently and voluntarily waived each of those rights and thereupon made the statement to the officers above mentioned.

The court then overruled defendant's objection to admission of the statements.

Defendant contends that the above findings are not supported by the evidence. At a voir dire hearing on the admissibility of a confession, the trial court must determine whether the State has met its burden of showing by a preponderance of the evidence that the confession was voluntary. *State v. Corley,* 310 N.C. 40, 52, 311 S.E. 2d 540, 547 (1984). However, appellate courts do not apply the preponderance of the evidence test. *Id.* Rather, the findings are conclusive on appeal if they are supported by competent evidence in the record. *Id.; State v. Perdue,* 320 N.C. 51, 59, 357 S.E. 2d 345, 350 (1987). Despite conflicting evidence, "[n]o reviewing court may properly set aside or modify those findings if so supported." *State v. Jackson,* 308 N.C. 549, 569, 304 S.E. 2d 134, 145 (1983). However, the conclusions of law are fully reviewable. *State v. Perdue,* 320 N.C. at 59, 357 S.E. 2d at 350.

At the voir dire hearing, the trial court heard testimony from Dr. Merceda Perry, S.B.I. Agent Carl Jackson, and Dr. Robert Rollins. Perry, a doctor at the Anson County Hospital, testified that:

Defendant arrived at the Anson County Hospital at around 6:30 p.m. Perry examined defendant and found that he had suffered a laceration to his forehead and a puncture wound to his buttocks. While these injuries are normally painful, defendant ex-

pressed only discomfort. Defendant appeared intoxicated, and he had difficulty answering questions coherently. Defendant did not receive any narcotic medication, and he was not hallucinating. A little after 6:30 p.m., defendant underwent a blood alcohol test which indicated a blood alcohol level equivalent to a .26 reading on the breathalyzer scale. To accelerate defendant's recovery from his intoxication, Perry administered intravenous fluids, dextrose and water. After defendant received these fluids, his mental and physical condition improved considerably; he became more coherent and cooperative. When Perry last saw defendant, around 7:20 or 7:25 p.m., defendant had become far more lucid than he was when Perry arrived. In Perry's opinion, defendant's condition would have continued to improve over the next hour. Perry released defendant from the hospital so that he could be transported to Raleigh.

S.B.I. Agent Jackson testified that:

Jackson and two deputy sheriffs picked up defendant at the Anson County Hospital. The officers first drove their van to the Anson County Sheriff's Department where defendant was served with three warrants for assault with a deadly weapon with intent to kill. The officers then drove toward Raleigh to deliver defendant to Central Prison. Jackson advised defendant of his constitutional rights by reading from the S.B.I. interrogation form. In response, defendant stated: "I was tried for my life, and I understand all this stuff." At 8:43 p.m., Jackson read defendant an explicit waiver of rights. Defendant stated that he understood the waiver and that he would talk to the officers; however, he did not want to sign the waiver because he could not see it. After agreeing to waive his rights, defendant complained that he was thirsty, and the officers purchased two soft drinks, which defendant consumed.

Jackson made sure defendant knew he was talking with law enforcement officers. Jackson also informed defendant that they were transporting him to Central Prison for safekeeping. Jackson then began questioning defendant about the day's events. Defendant made incriminating statements that Jackson later recounted in his testimony to the jury. At 10:20 p.m., defendant wanted a break because he was tired, and Jackson stopped questioning him.

At 10:37 p.m., Jackson tapped defendant on the shoulder and asked if he was asleep. Defendant indicated that he was not sleep-

ing and that he was cold; the officers covered him with a sheet and turned up the heat. Jackson asked defendant to continue his story, but defendant became annoyed with Jackson. The other officers asked defendant if he would answer their questions, and defendant agreed. Defendant proceeded to make further incriminating statements that Jackson related to the jury. In particular, defendant explained that he shot Deputy Horne because "he pressured me the wrong way." An officer asked defendant if he was fearing for his life, and defendant replied: "I'm fearing for my life right now." After the officers assured defendant that he was in no danger, the discussion continued. At 10:55 p.m., defendant remarked that he was tired and his hip was beginning to hurt. The officers then terminated the interview.

During the interview defendant appeared rational, and his statements made sense. Defendant was able to sit upright in the van by himself. Defendant did complain about stiffness in his hip. He appeared sober despite a slight to moderate odor of alcohol about his person.

Defendant is blind in his right eye, and his left eye was swollen shut because of the injury to his forehead. When defendant complained of being cold, the officers turned up the heat and maintained a comfortable temperature in the van. Jackson did not offer defendant any reward in return for a statement. Jackson did not coerce or pressure him to make a statement. Defendant never asked for an attorney. Jackson knew that defendant had been convicted of first degree murder in 1951 and felonious assault with intent to kill in 1977.

Robert Rollins, a forensic psychiatrist, testified that:

Defendant suffers from mixed personality disorder including features of paranoid thinking, impaired abstract thinking, impaired judgment and impaired perception. He also suffers from organic delusional syndrome, manifested by false beliefs. Generally antisocial, defendant tends to overreact violently to perceived threats. Defendant engages in episodic alcohol abuse, but, according to defendant's supervisor, he was a good worker who did not drink on the job. When defendant was admitted to Dorothea Dix Hospital in February 1985, he achieved an I.Q. test score of seventy-four, which places him in the "borderline range of in-

tellectual functioning." However, he did achieve an I.Q. score of eighty-nine in May 1980.

Based on Dr. Perry's description of defendant's condition and treatment on the night of the shooting, Rollins believed that defendant's intoxicated condition would have improved over time. Nonetheless, defendant would have been substantially intoxicated when the interrogation took place, and this intoxication would have exacerbated defendant's mental disabilities. Because of his mental disorders, defendant would not have been capable of voluntarily waiving his rights at the time of the interview.

The above voir dire testimony establishes that the pertinent findings are supported by competent evidence. They thus are binding on this Court. *State v. Perdue*, 320 N.C. at 59, 357 S.E. 2d at 350.

[3] In addition to a general challenge to the findings, defendant specifically disputes the finding that he made an express waiver of his rights. He contends that, rather than merely declining to sign a waiver he could not see, he in fact refused to waive his rights. Agent Jackson explicitly testified, however, that defendant stated that he understood his rights and agreed to talk with the officers. This evidence supports the trial court's finding.

[4] Defendant also specifically challenges the finding that he never expressed a desire to terminate the interview; he contends that he invoked his rights by asking the officers to terminate the questioning at 10:20 p.m. Jackson expressly testified, however, that defendant wanted to take a break because he was tired, and that he subsequently agreed to resume the conversation. Thus, the finding is again supported by the evidence.

Defendant further contends that the findings do not support the conclusions that he made a voluntary confession and waiver of his *Miranda* rights. While the findings, if supported by evidence, are binding upon this Court, the conclusions of law are fully reviewable. *Id.* The legal significance of the findings is a question of law for this Court. *State v. Jackson*, 308 N.C. at 582, 304 S.E. 2d at 152.

[5] In determining the voluntariness of the confession and the waiver of *Miranda* rights, we look to the totality of the circumstances. *Id.* at 581, 304 S.E. 2d at 152. However, police coer-

cion is a necessary predicate to a determination that a waiver or statement was not given voluntarily within the meaning of the Due Process Clause of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 93 L.Ed. 2d 473 (1986). Because the purported waiver and the statement arose within the same set of circumstances, we discuss the voluntariness of the confession as a single issue. *Cf. State v. Corley*, 310 N.C. at 48, 311 S.E. 2d at 545 (despite compliance with *Miranda*, ultimate question determining admissibility of confession is whether it in fact was made voluntarily).

[6] Defendant previously had been convicted of two felonies. He told Agent Jackson that because of this experience, he understood "all this stuff" (*i.e.*, his rights). Prior experience with the criminal justice system "is an important consideration in determining whether an inculpatory statement was made voluntarily and understandingly." *State v. Fincher*, 309 N.C. 1, 20, 305 S.E. 2d 685, 697 (1983) (defendant's one prior arrest considered significant in determining voluntariness of confession); *see also State v. Jackson*, 308 N.C. at 582, 304 S.E. 2d at 153. This circumstance thus supports the conclusions that the waiver and the confession were voluntary.

[7] While intoxication is a circumstance critical to the issue of voluntariness, intoxication at the time of a confession does not necessarily render it involuntary. *State v. Perdue*, 320 N.C. at 59-60, 357 S.E. 2d at 350-51. It is simply a factor to be considered in determining voluntariness. *See* Annot. "Sufficiency of Showing that Voluntariness of Confession or Admission was Affected by Alcohol or Other Drugs," 25 A.L.R. 4th 419 (1983 and Supp. 1987). The confession "is admissible unless the defendant is so intoxicated that he is unconscious of the meaning of his words." *State v. Oxendine*, 303 N.C. 235, 243, 278 S.E. 2d 200, 205 (1981).

At about 6:30 p.m. defendant had a blood alcohol level equivalent to a .26 reading on the breathalyzer scale, and he appeared intoxicated. Dr. Perry administered fluids to defendant to accelerate his recovery from his intoxication. During the next hour, Perry observed considerable improvement in defendant's mental and physical condition. Both Perry and Rollins agreed that defendant's condition would have continued to improve over time. The officers did not begin questioning defendant until some two

hours after the blood alcohol test. Agent Jackson explicitly testified that defendant appeared to be sober during the interview. Jackson also stated that defendant spoke rationally and coherently. The trial court specifically found that defendant was not under the influence of alcohol during the interview. There was ample evidence to support this finding. *See State v. McClure,* 280 N.C. 288, 291, 185 S.E. 2d 693, 695 (1972). Therefore, the fact that defendant may have experienced some lingering, mild intoxication at the time of the confession did not preclude the conclusion that he confessed voluntarily. *State v. Perdue,* 320 N.C. at 59-60, 357 S.E. 2d at 350-51; *see also Bryant v. State,* 16 Ark. App. 45, 696 S.W. 2d 773 (1985) (less than an hour after defendant signed a waiver of his *Miranda* rights, he had a blood alcohol level of .28; waiver held voluntary). Rather, defendant's intoxication was relevant to his credibility, which was a question for the jury. *State v. McClure,* 280 N.C. at 290-91, 185 S.E. 2d at 695 (citing *State v. Logner,* 266 N.C. 238, 145 S.E. 2d 867, *cert. denied,* 384 U.S. 1013, 16 L.Ed. 2d 1032 (1966)).

[8] While important, subnormal mentality—standing alone—will not render a confession inadmissible. *State v. Taylor,* 290 N.C. 220, 231, 226 S.E. 2d 23, 29 (1976) (citing *State v. Thompson,* 287 N.C. 303, 318, 214 S.E. 2d 742, 752 (1975), *modified as to death penalty,* 428 U.S. 908, 49 L.Ed. 2d 1213 (1976)). If a person has the mental capacity to testify and to understand the meaning of his statements, he has sufficient mental capacity to make a voluntary confession. *Id.*

Rollins testified that defendant's I.Q. placed him in the borderline range of intellectual functioning; however, there was no testimony that defendant did not have sufficient intelligence to understand the meaning of his words. Moreover, Perry reported that after defendant received fluids he responded coherently to questions. Defendant spoke rationally during his extensive conversation with the officers. He held a job prior to the shooting, and his supervisor described him as a good worker. He also had sufficient mental capacity to testify at trial. The evidence thus permitted a conclusion that defendant had sufficient mental capacity to waive his rights and voluntarily confess.

[9] Rollins testified that defendant's mental disorders would prevent him from making a truly voluntary confession. However,

Jackson had ample opportunity to observe defendant at the time the waiver and statements were made, and he gave substantial testimony indicating that defendant was able to comprehend the discussion. When a non-expert has had a reasonable opportunity to observe a defendant and to form an opinion based on such observation, he may testify as to his opinion of the defendant's mental condition. *State v. Taylor*, 290 N.C. at 232, 226 S.E. 2d at 30. The evidence thus did not preclude a conclusion that defendant's mental disorders did not prevent his making a voluntary confession.

The evidence did not indicate that defendant's blindness or injuries at the time of his confession had any bearing on the voluntariness of his waiver and statement. They were not shown to have precluded understanding or a free exercise of the will. *Cf. State v. White*, 291 N.C. 118, 123, 229 S.E. 2d 152, 155 (1976) ("Illiteracy does not preclude understanding or a free exercise of the will.").

Finally, we note the absence of circumstances that we have often emphasized in our consideration of voluntariness:

> [Defendant] was not deceived or tricked about the nature of the crime involved or the possible punishment. . . . He was not subjected to prolonged uninterrupted interrogation. He was not subjected to physical threats or shows of violence. No promises were made to him in return for his confession.

*State v. Jackson*, 308 N.C. at 582, 304 S.E. 2d at 152-53 (citations omitted). The absence of these circumstances supports the conclusion that the waiver and statements were made voluntarily. *See Colorado v. Connelly*, 479 U.S. 157, 93 L.Ed. 2d 473.

[10]  For the foregoing reasons, after a thorough review of the record we conclude that the totality of the circumstances permitted the trial court's conclusion that defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights and that his statements were made freely, understandingly, and voluntarily. We thus find no error in the denial of defendant's motion to suppress these statements.

[11]  Defendant next challenges the overruling of his objection to the prosecutor's argument concerning the expert testimony of defendant's psychiatrists. The prosecutor argued:

Well, I want to tell you this about psychiatric testimony. If they were the so-called experts of all times and if the law recognized them as the expert[s] on what the condition of somebody's mind was, you wouldn't be hearing the case.

MR. STOKES: OBJECT.

THE COURT: OVERRULED. Go ahead[.]

MR. LOWDER: The law says that you may hear from the so-called expert witnesses, yes, and you can consider that, but it also says that you may take into account what other people have said about him. We've had other witnesses that told you about him. We had his neighbor right across the street to tell you how he was acting on this day.

Defendant contends that under N.C.G.S. § 8C-1, Rule 702, the law does recognize an expert forensic psychiatrist, qualified and accepted by the court, as an expert witness on "what the condition of somebody's mind was." He asserts that the prosecutor deliberately misstated the law in order to mislead the jury.

It is well established in this jurisdiction that "[t]estimony regarding mental capacity is not confined to expert witnesses alone." *State v. Evangelista,* 319 N.C. 152, 162, 353 S.E. 2d 375, 382-83 (1987). "Anyone who has had a reasonable opportunity to form an opinion is permitted to give his opinion upon the issue of mental capacity." *Id.* at 162, 353 S.E. 2d at 383; *see also State v. Davis,* 321 N.C. 52, 55-58, 361 S.E. 2d 724, 726-27 (1987). The evidence here included both expert and non-expert opinion testimony on defendant's sanity at the time of the shooting. The argument in question was an exhortation to the jury to consider both kinds of testimony in resolving this question.

In isolation, the statement "if the law recognized them [psychiatrists] as the expert[s] on what the condition of somebody's mind was, you wouldn't be hearing the case" could be misleading. However, the prosecutor went on to state correctly that the law permits hearing from the experts and considering what they have to say. He then urged the jurors to consider not only the expert testimony but also that of the other witnesses. "Arguments of counsel are largely in the control and discretion of the trial court. The appellate courts ordinarily will not review the exercise of that discretion unless the impropriety of counsel's remarks is

extreme and is clearly calculated to prejudice the jury." *State v. Huffstetler*, 312 N.C. 92, 111, 322 S.E. 2d 110, 122 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985). Viewed in context, the potentially misleading portion of the prosecutor's argument was not so "extreme and . . . clearly calculated to prejudice the jury" as to warrant a holding that the trial court abused its discretion in overruling defendant's objection.

[12] Defendant next assigns error to the prosecutor's argument suggesting that the fact that defendant was competent to stand trial indicated that his insanity defense lacked merit. Defendant contends that this argument tended to confuse the jury by blending the issues of competency to stand trial and insanity.

Although potentially misleading, the argument did not misstate the law. It simply urged the jury to consider evidence of defendant's state of mind at the time of trial in passing upon his state of mind at the time of the shooting. The trial court gave clear and correct instructions on insanity. *See State v. Evangelista*, 319 N.C. at 161, 353 S.E. 2d at 382. In light of the foregoing, we decline to find an abuse of discretion in the failure to sustain defendant's objection to the argument.

[13] Defendant next contends that the trial court erred by sustaining the State's objection to a portion of his closing argument. Dr. Rollins had testified that defendant was legally insane at the time of the shooting and that he lacked the mental capacity to premeditate and deliberate the act. Addressing the relevance of Dr. Rollins' testimony, defense counsel argued:

> And he said too that at that time, on that evening, December the 22nd, 1984, that he could not premeditatedly [sic] or deliberate to shooting the deputy. That's what he said. How is that significant? His Honor—I believe he will charge you that in order for you to find the defendant guilty of first degree murder, that before you can do that, you've first got to be satisfied beyond a reasonable doubt [that] certain elements of the crime are met. Among those, one of the elements of first degree murder is that there was premeditation and deliberation, unlawful killing of a human being with premeditation and deliberation. Premeditation and deliberation. That thought went into it. That there was time to think, to reflect, to choose to do the thing.

Dr. Rollins with all of his years of experience and with all of the work that went into his examination of Dock McCoy says he could not premeditate and deliberate at that time.

You've got to find before you can convict this man of first degree murder not only could he but that he did, so, in effect, what you've got to find is that not only was Dr. Rollins wrong about it, but that he was wrong about it beyond a reasonable doubt.

The following then occurred:

MR. LOWDER: We OBJECT to that.

MR. STOKES: That's a fair comment.

MR. LOWDER: We ask the Judge to rule on that objection.

. . .

THE COURT: I'll have to SUSTAIN that OBJECTION.

Defendant contends that his argument properly stated the proposition that the State bore the burden of proving beyond a reasonable doubt the premeditation and deliberation element of first degree murder. The State asserts that the argument implied that the State bore the burden of disproving the insanity defense, which is an inaccurate statement of our law. *State v. Mize,* 315 N.C. 285, 293-94, 337 S.E. 2d 562, 567 (1985). We conclude that the argument is reasonably subject to either of these interpretations. Although counsel should be allowed wide latitude in arguing to the jury, the control of the exercise of this privilege ordinarily lies in the sound discretion of the trial court. *State v. Robbins,* 319 N.C. 465, 505, 356 S.E. 2d 279, 303, *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 226 (1987). Because the jury could have interpreted defendant's argument to misstate the law as applied to the facts, we find no abuse of discretion in the sustaining of the objection.

Further, the charge correctly and unambiguously emphasized the State's burden of proving premeditation and deliberation beyond a reasonable doubt. *See State v. Mize,* 315 N.C. at 293, 337 S.E. 2d at 567. In light of this, and in view of the record as a whole, we do not believe there is a reasonable possibility that the jury would have reached a different result if the court had over-

ruled the objection. Thus, assuming error, *arguendo*, defendant has not carried his burden of showing prejudice. N.C.G.S. § 15A-1443(a) (1983).

We conclude that the guilt phase of defendant's trial was fair and free of prejudicial error.

### SENTENCING PHASE

[14] Defendant contends that he is entitled to a new sentencing hearing because the jury failed to find the statutory mitigating circumstance that "the defendant was under the influence of mental or emotional disturbance." N.C.G.S. § 15A-2000(f)(2) (1983). Defendant presented two psychiatrists who testified that he was suffering from significant psychological disorders at the time of the shooting. He argues that there thus was uncontradicted and inherently credible evidence to support the existence of this mitigating circumstance, and that the jury's refusal to find this circumstance makes the sentencing determination unreliable in violation of the Eighth and Fourteenth Amendments.

We conclude that other evidence regarding defendant's mental and emotional state at the time of the shooting conflicted with that presented by defendant's experts. Prior to the shooting, defendant had held the same job for four years, and his supervisor described him as a good employee. On the day of the shooting, defendant was able to aim and fire his shotgun. When confronted by Haskell, defendant was able to explain that he was firing his shotgun into the air because "it's Christmas." At several points prior to the shooting, defendant conversed with the officers. After receiving medical treatment for his gunshot wounds, defendant was able to answer Dr. Perry's questions coherently. During the ride to Raleigh, defendant "appeared to be rational in all respects." Defendant gave a detailed narration of the day's events, and he explained that the reason he shot Horne was because Horne "pressured" him. Agent Jackson testified that defendant responded logically, and with clarity of recollection and expression, to questions posed by the officers. Defendant's own witness, Dr. Lara, testified that he found no evidence that defendant suffered from hallucinations, delusions, or "an ongoing psychosis."

We also reject defendant's assertion that the testimony of his psychiatric experts was inherently credible. Defendant's mental

and emotional state *at the time of the crime* is the central question presented by the submission of the mitigating circumstance in question; however, neither of defendant's experts examined him until several weeks or months after the crime. *See State v. Smith,* 305 N.C. 691, 705-06, 292 S.E. 2d 264, 273-74, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982) (State's evidence concerning defendant's mental capacity conflicted with defendant's expert's after-the-fact opinions; "jury's duty to decide what to believe"). The jury was not required to believe defendant's evidence simply because the State did not specifically refute the testimony of defendant's experts. "Determining the credibility of evidence is at the heart of the fact-finding function." *State v. Jones,* 309 N.C. 214, 220, 306 S.E. 2d 451, 456 (1983).

Because the evidence concerning defendant's mental and emotional state was neither uncontradicted nor inherently credible, we find no merit in this argument. *See State v. Smith,* 305 N.C. at 706, 292 S.E. 2d at 274 ("all of the evidence" did not support the existence of a mitigating circumstance; defendant thus not entitled to peremptory instruction thereon).

[15] Defendant next contends that his rights under the Eighth and Fourteenth Amendments were violated by the trial court's allowing the District Attorney, in closing argument, to remind the jurors of their commitments not to have sympathy for defendant because he was intoxicated. The argument was as follows:

> Number seven, [defendant's] ability to remember the events of December the 22nd, 1984, is actually impaired, they contend. And that's the last one. I don't know. He was drinking liquor and I told you before you were chosen as a juror that if it is shown that he's intoxicated, were you going to have sympathy, sympathetic to his cause. As I recall, you said you wouldn't. I don't know. He can remember what he did because he told the officers about it.

Defendant did not object to this argument at trial. We thus can find an abuse of discretion in the trial court's failure to intervene *ex mero motu* only if impropriety in the argument was "gross indeed." *State v. Johnson,* 298 N.C. 355, 368-69, 259 S.E. 2d 752, 761 (1979). We find no gross impropriety. We have held above that the trial court did not abuse its discretion by failing *ex mero motu* to prohibit voir dire questions to prospective jurors regard-

ing their sympathies toward an intoxicated person. We likewise find no abuse of discretion in the trial court's allowing the District Attorney—in closing argument, without objection—to gently remind the jurors of their responses to these questions.

[16]   Defendant next contends that the trial court's sentencing instructions were erroneous and unconstitutional because they required jury unanimity on the existence of a mitigating circumstance before that circumstance could be considered for the purpose of sentencing. We find no error.

We resolved this issue contrary to defendant's position in *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983), *overruled on other grounds, State v. Shank*, 322 N.C. 243, 367 S.E. 2d 639 (1988). In *Kirkley*, the trial court instructed the jury that "the defendant has the burden of persuading the jury as to the existence of any mitigating circumstance and if all twelve jurors are unable to agree that a specific mitigating circumstance exists they must find that it does not exist." *Kirkley*, 308 N.C. at 217-18, 302 S.E. 2d at 156. Therefore, the jury could only find a mitigating circumstance if it unanimously agreed that it existed. The defendant argued that the court should have instructed that the jurors could only determine that a mitigating circumstance did *not* exist if they unanimously found that it did not exist. *Id.* at 218, 302 S.E. 2d at 157.

We held that in a capital case "the jury must unanimously find that an aggravating circumstance exists before that circumstance may be considered by the jury in determining its sentence recommendation" and that "consistency and fairness dictate that a jury unanimously find that a mitigating circumstance exists before it may be considered for the purpose of sentencing." *Id.* We stated:

> The consideration of mitigating circumstances must be the same as the consideration of aggravating circumstances. The unanimity requirement is only placed upon the finding of whether an aggravating or mitigating circumstance exists. With the exceptions of who has the burden of proof and the different quantum of proof required to establish the existence of a circumstance, we see no reason to distinguish the method a jury must use in finding the existence or nonexistence of aggravating and mitigating circumstances during

the sentencing procedure. It must be kept in mind that when the sentencing procedure begins there are no aggravating or mitigating circumstances deemed to be in existence. Each circumstance must be established by the party who bears the burden of proof and if he fails to meet his burden of proof on any circumstance, that circumstance may not be considered in that case.

In determining whether a mitigating circumstance exists, the jury is free to consider all the evidence relevant to that circumstance. This procedure is in accord with the requirements of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (1978) and *Eddings v. Oklahoma*, --- U.S. ---, 102 S.Ct. 869, 71 L.Ed. 2d 1 (1982). We therefore find no error in the trial judge's instructions to the jury concerning the unanimity requirement on mitigating circumstances.

*Id.* at 219, 302 S.E. 2d at 157.

We have declined to reexamine our *Kirkley* holding in several cases, including the following: *State v. Lloyd*, 321 N.C. 301, 364 S.E. 2d 316 (1988); *State v. Holden*, 321 N.C. 125, 362 S.E. 2d 513 (1987), *cert. denied*, --- U.S. ---, 100 L.Ed. 2d 935 (1988); *State v. Brown*, 320 N.C. 179, 358 S.E. 2d 1, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 406 (1987); *State v. Noland*, 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369 (1985); *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, *cert. denied*, 469 U.S. 963, 83 L.Ed. 2d 299 (1984); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983).

As a matter of state law, then, this issue is clearly settled contrary to defendant's position. Defendant contends, however, that the recent decision of the United States Supreme Court in *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988), requires that we overrule *Kirkley* and its progeny. In *Mills*, the Supreme Court held that the trial court's instructions to the jury were constitutionally infirm because "reasonable jurors . . . may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.* at ---, 100 L.Ed. 2d at 400.

*Mills* is one of a long line of cases in which the United States Supreme Court has examined the constitutionality of state

capital-sentencing schemes. The Court has faced the tensions between two concerns relating to such schemes: the constitutional requirement of individualized sentencing, and the constitutional requirement that the death penalty not be inflicted arbitrarily and capriciously. In *Lockett v. Ohio*, 438 U.S. 586, 57 L.Ed. 2d 973 (1978), the court recognized that "[t]he signals from this Court have not . . . always been easy to decipher" and that it had "an obligation to reconcile previously differing views in order to provide [clear] guidance." *Lockett*, 438 U.S. at 602, 57 L.Ed. 2d at 988 (plurality opinion).

The plurality opinion in *Lockett* explained how, in *Furman v. Georgia*, 408 U.S. 238, 33 L.Ed. 2d 346 (1972), a plurality of the Court had concluded that "discretionary sentencing, unguided by legislatively defined standards, violated the Eighth Amendment" because it was discriminatory, "wantonly" imposed and "afforded 'no meaningful basis for distinguishing the few cases in which it [was] imposed from the many cases in which it [was] not.'" *Lockett*, 438 U.S. at 599, 57 L.Ed. 2d at 986 (quoting *Furman*, 408 U.S. at 257, 310, 313, 33 L.Ed. 2d at 359, 390, 392). In attempting to follow *Furman*, some states adopted mandatory death penalties for certain crimes, thus eliminating any jury discretion in sentencing. *Lockett*, 438 U.S. at 599-600, 57 L.Ed. 2d at 986-87.

In the wake of *Furman*, the Court examined death penalty statutes in five states. A plurality found the mandatory death sentence statutes in Louisiana and North Carolina unconstitutional. *Roberts v. Louisiana*, 428 U.S. 325, 49 L.Ed. 2d 974 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944 (1976). A plurality also found, however, that the Georgia, Texas, and Florida statutes, which were not mandatory and which provided certain safeguards to the defendant in the capital-sentencing process, were not constitutionally invalid. *Gregg v. Georgia*, 428 U.S. 153, 49 L.Ed. 2d 859 (1976); *Jurek v. Texas*, 428 U.S. 262, 49 L.Ed. 2d 929 (1976); *Proffitt v. Florida*, 428 U.S. 242, 49 L.Ed. 2d 913 (1976). In *Gregg*, the plurality wrote that "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195, 49 L.Ed. 2d at 887. From these opinions, the plurality opinion in *Lockett* concluded that "sentencing procedures should not create 'a sub-

stantial risk that the death penalty [will] be inflicted in an arbitrary and capricious manner.'" *Lockett*, 438 U.S. at 601, 57 L.Ed. 2d at 987 (quoting *Gregg*, 428 U.S. at 188, 49 L.Ed. 2d at 883).

> In the view of the three Justices, . . . *Furman* did not require that all sentencing discretion be eliminated, but only that it be "directed and limited," 428 U.S., at 189, 49 L.Ed. 2d 859, 96 S.Ct. 2909, so that the death penalty would be imposed in a more consistent and rational manner and so that there would be a "meaningful basis for distinguishing the . . . cases in which it is imposed from . . . the many cases in which it is not." *Id.*, at 188, 49 L.Ed. 2d 859, 96 S.Ct. 2909.

*Lockett*, 438 U.S. at 601, 57 L.Ed. 2d at 987-88.

The plurality opinion in *Lockett* acknowledged that mandatory death sentencing was unconstitutional. "[T]he sentencing process must permit consideration of the 'character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.'" *Lockett*, 438 U.S. at 601, 57 L.Ed. 2d at 988 (quoting *Woodson v. North Carolina*, 428 U.S. at 304, 49 L.Ed. 2d at 961 (plurality opinion)). The opinion stated that "the sentencer . . . [may] not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604, 57 L.Ed. 2d at 990 (emphasis in original).

Ohio's death-penalty statute, which the Court examined in *Lockett*, mandated the imposition of the death penalty where a jury had found at least one aggravating circumstance unless, considering "the nature and circumstances of the offense and the history, character, and condition of the offender," the court determined that at least one of three specified mitigating circumstances had been established by a preponderance of the evidence. *Id.* at 607, 57 L.Ed. 2d at 991-92. The plurality opinion concluded that "[t]he limited range of mitigating circumstances which may be considered by the sentencer under the Ohio statute is incompatible with the Eighth and Fourteenth Amendments" because it "preclude[d] consideration of relevant mitigating factors." *Id.* at 608, 57 L.Ed. 2d at 992. Therefore, the Court re-

State v. McKoy

versed the imposition of the death penalty and remanded for re-sentencing. *Id.* at 608-09, 57 L.Ed. 2d at 992.

In *Eddings v. Oklahoma,* 455 U.S. 104, 71 L.Ed. 2d 1 (1982), the Supreme Court applied the *Lockett* rule that "the sentencer . . . [may] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 110, 71 L.Ed. 2d at 8 (quoting *Lockett,* 438 U.S. at 604, 57 L.Ed. 2d at 990) (emphasis in original). The trial judge in *Eddings* had stated that, as a matter of law, he could not take into consideration that the defendant had come from a violent background. *Eddings,* 455 U.S. at 112-13, 71 L.Ed. 2d at 9-10. The Supreme Court held that "the sentencer [may not] refuse to consider, *as a matter of law,* any relevant mitigating evidence." *Id.* at 114, 71 L.Ed. 2d at 11 (emphasis in original). The Court reversed the death sentence and remanded for resentencing. *Id.* at 117, 71 L.Ed. 2d at 12.

In *Mills v. Maryland,* 486 U.S. ---, 100 L.Ed. 2d 384, the Supreme Court applied the *Lockett-Eddings* doctrine in holding that because the instructions to the jury on mitigating circum-stances were potentially misleading, "[t]he possibility that the . . . jury conducted its task improperly . . . [was] great enough to require resentencing." *Id.* at ---, 100 L.Ed. 2d at 399. The verdict form in *Mills* had three sections:

Section I stated:

Based upon the evidence we unanimously find that each of the following aggravating circumstances which is marked "yes" has been proven BEYOND A REASONABLE DOUBT and each aggravating circumstance which is marked "no" has not been proven BEYOND A REASONABLE DOUBT[.]

*Id.* at ---, 100 L.Ed. 2d at 400. Following this paragraph was a list of the submitted aggravating circumstances, each of which was followed by two blanks—one for a "yes" answer, the other for a "no" answer. Section I concluded:

(If one or more of the above are marked "yes," complete Section II. If all of the above are marked "no" do not complete Sections II and III.)

*Id.* at ---, 100 L.Ed. 2d at 400-01.

Section II stated:

> Based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked "yes" has been proven to exist by A PREPONDERANCE OF THE EVIDENCE and each mitigating circumstance marked "no" has not been proven BY A PREPONDERANCE OF THE EVIDENCE[.]

*Id.* at ---, 100 L.Ed 2d at 401. As in the first section, the proposed mitigating circumstances, numbered 1 through 7, were listed, each with blanks for "yes" and "no." Number 8 read, "Other mitigating circumstances exist, as set forth below." *Id.* at ---, 100 L.Ed. 2d at 401-02. Section II concluded:

> (If one or more of the above in Section II have been marked "yes," complete Section III. If all of the above in Section II are marked "no," you do not complete Section III.)

*Id.* at ---, 100 L.Ed. 2d at 402.

Section III read:

> Based on the evidence we unanimously find that it has been proven by A PREPONDERANCE OF THE EVIDENCE that the mitigating circumstances marked "yes" in Section II outweigh the aggravating circumstances marked "yes" in Section I.

Blanks designated "yes" and "no" followed. *Id.* at ---, 100 L.Ed. 2d at 403.

The fourth and final section read:

DETERMINATION OF SENTENCE

> Enter the determination of sentence either "Life Imprisonment" or "Death" according to the following instructions:

> 1. If all of the answers in Section I are marked "no" enter "Life Imprisonment."

> 2. If Section III was completed and was marked "yes" enter "Life Imprisonment."

> 3. If Section II was completed and all of the answers were marked "no" then enter "Death."

4. If Section III was completed and was marked "no" enter "Death."

*Id.* at ---, 100 L.Ed. 2d at 403.

In Section I, the jury answered "yes" to one of the aggravating circumstances and "no" to the rest. In Section II, it answered "no" to mitigating circumstances 1 through 7 and "none" to number 8 (the "catchall"). Having found no mitigating circumstances, the jury did not answer Section III. It returned a death sentence in response to the mandate of number three in the final section. *Id.* at ---, 100 L.Ed. 2d at 400-03.

This sentencing scheme mandated the death penalty if the jury unanimously found at least one aggravating circumstance and did not unanimously find any mitigating circumstances. Because the jury found one aggravating circumstance and no mitigating circumstances, it was required as a matter of law to impose the death penalty without completing Section III, which called for the weighing of aggravating and mitigating circumstances.

The defendant challenged his conviction and sentence, arguing that Maryland's capital-punishment statute was unconstitutionally mandatory as applied to him, because "even if some or all of the jurors were to believe *some* mitigating circumstance or circumstances were present, unless they could unanimously agree on the existence of the *same* mitigating factor, the sentence necessarily would be death." *Id.* at ---, 100 L.Ed. 2d at 392 (emphasis in original). The Supreme Court granted certiorari "[b]ecause of the importance of [this] issue in Maryland's capital-punishment scheme." *Id.* at ---, 100 L.Ed. 2d at 393.

After examining the verdict form and instructions under which the jury had sentenced the defendant to death, the Court concluded that even if the jurors had reached Section III, "they were not free . . . to consider *all* relevant evidence in mitigation as they balanced aggravating and mitigating circumstances. Section III instructed the jury to weigh only those mitigating circumstances marked 'yes' in Section II." *Id.* at ---, 100 L.Ed. 2d at 397 (emphasis in original).

[T]here is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in at-

tempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. . . . The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.

*Id.* at ---, 100 L.Ed. 2d at 400. Because of the risk that the jury was improperly precluded from considering certain *relevant* mitigating evidence, the Court held that the Maryland scheme violated the doctrine articulated in *Lockett* and *Eddings. See id.* at ---, 100 L.Ed. 2d at 400. Therefore, the Court vacated the judgment of the Court of Appeals, insofar as it sustained the death penalty, and remanded for resentencing. *Id.* at ---, 100 L.Ed. 2d at 400.

In *Franklin v. Lynaugh,* --- U.S. ---, 101 L.Ed. 2d 155 (1988), a case decided after *Mills,* the Supreme Court again examined Texas' capital-sentencing process. That process provided for the submission of two "Special Issues" to the jury. If the jury answered "yes" to both questions, the defendant would be sentenced to death. *Id.* at ---, 101 L.Ed. 2d at 162. The defendant in *Franklin* requested instructions that the jurors should take mitigating evidence into account in answering the Special Issues, so that they could answer "no" to either one or both of the Special Issues, even if they otherwise would have answered the Special Issues "yes." *Id.* at ---, 101 L.Ed. 2d at 162-63. The trial court instead instructed the jurors that they should reach their verdict based on all the evidence. *Id.* at ---, 101 L.Ed. 2d at 163. The defendant argued that the Special Issues precluded the jury from considering certain mitigating evidence. Even though the Texas capital-sentencing process does not mention mitigating evidence, *id.* at ---, 101 L.Ed. 2d at 177 (Stevens, J., dissenting), the plurality opinion held that the Texas procedure was not unconstitutional.

The plurality opinion stated that there are "two lines of cases . . . [which] are somewhat in 'tension' with each other" — the cases holding that the jury must not be precluded from considering all relevant evidence, and the cases holding that states must channel the exercise of jury discretion, *id.* at ---, 101 L.Ed. 2d at

171, and that the procedure in Texas "accommodates *both* of these concerns." *Id.* at ---, 101 L.Ed. 2d at 171 (emphasis in original). The plurality opinion concluded that "*Lockett* does not hold that the State has no role in structuring or giving shape to the jury's consideration of . . . mitigating factors." *Id.* at ---, 101 L.Ed. 2d at 169.

> [T]his Court has never held that jury discretion must be unlimited or unguided; we have never suggested that jury consideration of mitigating evidence must be undirected or unfocused; we have never concluded that States cannot channel jury discretion in capital sentencing in an effort to achieve a more rational and equitable administration of the death penalty.

*Id.* at ---, 101 L.Ed. 2d at 170. States "must channel the [capital] sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.' " *Id.* at ---, 101 L.Ed. 2d at 170 (quoting *Godfrey v. Georgia,* 446 U.S. 420, 428, 64 L.Ed. 2d 398, 406 (1980) (plurality opinion) (footnotes omitted) ).

Thus, the Supreme Court has given individual scrutiny to several states' capital-sentencing procedures to determine whether they were non-mandatory and allowed for individualized sentencing, yet adequately channeled the discretion of the sentencer. The Court has upheld some procedures—*see Franklin v. Lynaugh,* --- U.S. ---, 101 L.Ed. 2d 155; *Gregg v. Georgia,* 428 U.S. 153, 49 L.Ed. 2d 859; *Jurek v. Texas,* 428 U.S. 262, 49 L.Ed. 2d 929; *Proffitt v. Florida,* 428 U.S. 242, 49 L.Ed. 2d 913—while declaring others invalid—*see Mills v. Maryland,* 486 U.S. ---, 100 L.Ed. 2d 384; *Eddings v. Oklahoma,* 455 U.S. 104, 71 L.Ed. 2d 1; *Lockett v. Ohio,* 438 U.S. 586, 57 L.Ed. 2d 973; *Roberts v. Louisiana,* 428 U.S. 325, 49 L.Ed. 2d 974; *Woodson v. North Carolina,* 428 U.S. 280, 49 L.Ed. 2d 944. Therefore, in examining the aspect of our capital-sentencing process in question here, we must look at that aspect individually and in the context of the whole.

In the case now before us, the verdict form in the sentencing phase had four sections:

The first section, Issue One, listed the submitted aggravating circumstances and asked whether the jury unanimously found

from the evidence the existence of any of those circumstances. The jury unanimously found the two aggravating circumstances submitted.

The second section, Issue Two, listed the submitted mitigating circumstances and asked whether the jury unanimously found from the evidence the existence of any of those circumstances. Of the eight mitigating circumstances submitted, the jury answered "yes" to two and "no" to six, including the "catch-all" ("[a]ny other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value").

The third section read:

ANSWER ISSUE THREE IF YOU ANSWERED ISSUE TWO "YES." IF YOU ANSWERED ISSUE TWO, "NO," SKIP ISSUE THREE AND ANSWER ISSUE FOUR.

Issue Three stated:

*Issue Three:* Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found by you is, or are, insufficient to outweigh the aggravating circumstance or circumstances found by you?

*Answer:*

The fourth section read:

IF YOU ANSWER ISSUE THREE, "NO," INDICATE LIFE IMPRISON-MENT UNDER "RECOMMENDATION AS TO PUNISHMENT." IF YOU ANSWER ISSUE THREE, "YES," PROCEED TO ISSUE FOUR.

Issue Four stated:

Do you unanimously find, beyond a reasonable doubt, that the aggravating circumstance or circumstances found by you is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by you?

*Answer:*

The jury answered "yes" to Issues Three and Four and returned a recommendation of the death penalty.

Our capital-sentencing procedure, as this case shows, differs in two significant ways from Maryland's procedure:

First, the instructions to the jury as to when it must impose the death penalty are different. Maryland's procedure required the jury to impose the death penalty if it "found" at least one aggravating circumstance and did not "find" any mitigating circumstances. It also required the jury to impose the death penalty if it unanimously found that the mitigating circumstances did not outweigh the aggravating circumstances. Issue Three here requires the jury to weigh the "found" mitigating circumstances against the "found" aggravating circumstances. In contrast to the Maryland procedure, however, it does not mandate the death penalty where there are no mitigating circumstances and at least one aggravating circumstance, nor does it mandate the death penalty if the mitigating circumstances do not outweigh the aggravating circumstances. Rather, it requires the jury then to answer Issue Four. Issue Four ensures that a jury may return a recommendation of life imprisonment if it feels that the aggravating circumstances are not sufficiently substantial to call for the death penalty, even if it has found several aggravating circumstances and no mitigating circumstances. Maryland's capital-sentencing procedure, which the Supreme Court found constitutionally infirm in *Mills*, did not include a section equivalent to Issue Four here.

Second, in North Carolina evidence in effect becomes legally irrelevant to prove mitigation if the defendant fails to prove to the satisfaction of all the jurors that such evidence supports the finding of a mitigating factor. "Each circumstance must be established by the party who bears the burden of proof and if he fails to meet his burden of proof on any circumstance, that circumstance may not be considered in that case." *State v. Kirkley*, 308 N.C. 196, 218, 302 S.E. 2d 144, 157 (1983). A requirement that the defendant must carry a certain evidentiary burden to prove the existence of a mitigating factor is a proper limitation of the jury's discretion. *See Patterson v. New York*, 432 U.S. 197, 201, 209, 53 L.Ed. 2d 281, 286-87, 291 (1977) (states normally have the power to regulate burdens of production and persuasion and "[i]f the State . . . chooses to recognize a factor that mitigates the degree of criminality or punishment, . . . the State may assure itself that the fact has been established with reasonable certainty"). The instructions and verdict form in our capital-sentencing procedure serve to channel the jury's discretion by ensuring that, when

the jury makes its final sentencing determination, it will only consider evidence which we have, in effect, determined to be relevant. If all the jurors do not agree on the existence of a specific mitigating circumstance, then the defendant has failed to meet his or her burden of proof on that circumstance and the evidence regarding it is not legally relevant for sentencing purposes. Therefore, the instruction to the jury to weigh only the mitigating circumstances "found" by a unanimous vote was an instruction to consider only the *relevant* mitigating evidence in answering Issues Three and Four.

In *Mills*, the Maryland Court of Appeals had held that jurors could only mark "no" on a mitigating circumstance when they *unanimously* found that mitigating circumstance *not* to exist. *Mills v. State*, 310 Md. 33, 55, 527 A. 2d 3, 13 (1987). Where some, but not all, jurors agreed on the existence of a mitigating circumstance, the jury could not mark "no" to that circumstance; thus, unlike in North Carolina, the mitigating evidence introduced to support that mitigating circumstance remained legally relevant even though the jurors did not agree unanimously on the existence of the mitigating circumstance.

The fact that such evidence remained legally relevant apparently was significant in the Supreme Court's resolution of *Mills*. The Court noted that "[n]o one has argued here, nor did the Maryland Court of Appeals suggest, that mitigating evidence can be rendered legally 'irrelevant' by one holdout vote." *Mills v. Maryland*, --- U.S. at --- n.7, 100 L.Ed. 2d at 394 n.7. The Court went on to state that the problem in *Mills* was that in answering Section III of the verdict form, the jurors "were not free . . . to consider *all relevant evidence* in mitigation as they balanced aggravating and mitigating circumstances." *Id.* at ---, 100 L.Ed. 2d at 397 (emphasis added). The instructions in *Mills* were potentially misleading and thus inadequate because they did not clearly permit the jury to consider all relevant evidence. Under North Carolina law, the jury is not prevented from considering relevant mitigating evidence at any time during sentencing.

Like the United States Supreme Court, *see Godfrey v. Georgia*, 446 U.S. at 428, 64 L.Ed. 2d at 406, we have emphasized the need for guided discretion in the capital-sentencing process. In *State v. Brown*, 320 N.C. 179, 358 S.E. 2d 1, *cert. denied*, ---

U.S. ---, 98 L.Ed. 2d 406 (1987), the defendant argued that the trial court erroneously instructed the jury that it could only consider the "found" mitigating circumstances in weighing the mitigating and aggravating circumstances. He contended that the jury should have been able to consider circumstances not "found" by the jury and even circumstances which had not been written on the verdict form. *Id.* at 217, 358 S.E. 2d at 25-26. We stated that such a procedure would "sanction an invitation to caprice" in the sentencing phase of a capital trial. *Id.* at 217, 358 S.E. 2d at 26. We discussed the concern, often articulated by the United States Supreme Court, that the jury's discretion must be limited to prevent arbitrary and capricious infliction of the death penalty:

> "The consideration of mitigating circumstances must be the same as the consideration of aggravating circumstances." There is no reason to confound the jury's decision process with arbitrary, "inarticulable" factors that may be applied in mitigation of a sentence but not in aggravation of it. "[T]he jury may only exercise guided discretion in making the underlying findings required for a recommendation of the death penalty within the 'carefully defined set of statutory criteria that allow them to take into account the nature of the crime. and the character of the accused.' "

*Id.* at 217-18, 358 S.E. 2d at 26 (citations omitted); *see also State v. Kirkley*, 308 N.C. at 219, 302 S.E. 2d at 157.

[17] Our capital-sentencing procedure allows for individualized sentencing. It allows the jury to find circumstances in mitigation, both submitted circumstances and any other circumstance the jury deems to have mitigating value. It allows the jury to consider all relevant evidence in deciding whether to recommend a sentence of death. Finally, it requires the jury — before recommending that the defendant be sentenced to death — to weigh the "found" aggravating and "found" mitigating circumstances and to decide whether the "found" aggravating circumstances, considered with the "found" mitigating circumstances, are sufficiently substantial to call for the death penalty.

In addition to allowing for individualized sentencing, our capital-sentencing procedure also guides the jury's discretion so as to guard against the arbitrary and capricious infliction of the death penalty. It requires the State to prove the existence of an

aggravating circumstance beyond a reasonable doubt. It requires the defendant to prove the existence of a mitigating circumstance by a preponderance of the evidence. It then allows the jury to consider only that evidence which is relevant, *i.e.*, the evidence which the jury has unanimously "found," in sentencing the defendant.

Our capital-sentencing procedure thus provides a proper balance between individualized sentencing and guided discretion and therefore, we believe, conforms with federal constitutional requirements.

The Supreme Court granted certiorari in *Mills* "[b]ecause of the importance of the issue in Maryland's capital-punishment scheme." *Id.* at ---, 100 L.Ed. 2d at 393. The decision in *Mills* thus appears to be statute-specific. This conclusion is further supported by the Court's treatment of three cases immediately after the decision in *Mills*. The Court denied certiorari in two cases from this state which raised the issue of whether North Carolina's requirement of jury unanimity on the existence of mitigating circumstances is unconstitutional. *See State v. Holden*, 321 N.C. 125, 362 S.E. 2d 513 (1987), *cert. denied*, --- U.S. ---, 100 L.Ed. 2d 935 (1988); *State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591 (1983), *cert. denied*, --- U.S. ---, 100 L.Ed. 2d 934 (1988). However, in a Maryland case raising the same issue as in *Mills*, the Court granted certiorari, vacated the judgment, and remanded for further consideration in light of *Mills*. *See Jones v. Maryland*, 310 Md. 569, 530 A. 2d 743 (1987), *cert. granted and judgment vacated*, --- U.S. ---, 100 L.Ed. 2d 916 (1988). We recognize that "a denial of a petition for a writ of certiorari . . . carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review." *Maryland v. Baltimore Radio Show*, 338 U.S. 912, 919, 94 L.Ed. 562, 566 (1950) (Frankfurter, J., opinion re: denial of certiorari); *see also Singleton v. Commissioner of Internal Revenue*, 439 U.S. 940, 944, 58 L.Ed. 2d 335, 336 (1978) (Stevens, J., opinion re: denial of certiorari). We do not suggest that the denial of certiorari in *Holden* and *Gardner* alone indicates that the Court decided that the defendants' arguments in those cases were without merit. However, we view the Court's action on *Jones* and its different treatment of *Holden* and *Gardner*, all in the immediate wake of *Mills*, as some indication that our capital-sentencing procedure differs sufficient-

ly from Maryland's that *Mills* does not control the question presented here.

In light of the foregoing precedent from the United States Supreme Court and from this Court, the differences between our capital-sentencing procedure and the Maryland procedure addressed by the Supreme Court in *Mills,* and the Supreme Court's treatment of *Jones, Holden,* and *Gardner* in the immediate wake of *Mills,* we are unable to conclude with any degree of certainty that *Mills* rendered our capital-sentencing procedure constitutionally infirm. We believe our clear, stable, considered procedure, established by *Kirkley* and adhered to in its progeny, is properly responsive to the requirement that capital-sentencing schemes provide for both individualized sentencing and guided sentencer discretion. We thus continue to adhere to our decisions in *Kirkley* and its progeny and hold that the instructions in question were without error.

Defendant raises the following "preservation" issues:

[18]  (1) He contends that the trial court erred in denying his motion to require the State to disclose potential aggravating circumstances it intended to rely upon at sentencing. Such disclosure is not required. *State v. Holden,* 321 N.C. 125, 153-54, 362 S.E. 2d 513, 531 (1987), *cert. denied,* --- U.S. ---, 100 L.Ed. 2d 935 (1988).

[19]  (2) He contends that the trial court erred in placing the burden of proving the existence of mitigating circumstances on him rather than on the State. This was not error. *State v. Brown,* 320 N.C. 179, 216, 358 S.E. 2d 1, 25, *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 406 (1987).

[20]  (3) He contends that the trial court erred in instructing the jury that it must recommend a death sentence if it answered issue four[1] affirmatively. This was not error. *State v. McDougall,* 308 N.C. 1, 26, 301 S.E. 2d 308, 323-24, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 173 (1983).

---

1. This issue was as follows: "Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances found by you is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by you?"

[21] (4) He contends that the trial court erred in sentencing him to death because N.C.G.S. § 15A-2000(e)(3)[2] is unconstitutionally vague and overbroad, both facially and as applied. The argument is without merit. *State v. Brown*, 320 N.C. at 213-14, 358 S.E. 2d at 23-24.

(5) He contends that N.C.G.S. § 15A-2000 in its entirety is unconstitutional. The argument is without merit. *State v. Brown*, 315 N.C. 40, 60-61, 337 S.E. 2d 808, 823-24 (1985), *cert. denied*, 476 U.S. 1165, 90 L.Ed. 2d 733 (1986), *overruled on other grounds*, *State v. Vandiver*, 321 N.C. 570, 364 S.E. 2d 373 (1988).

Defendant has not persuaded us that we should depart from our prior holdings on these "preservation" issues, and we decline to do so.

We conclude that the sentencing phase of defendant's trial was fair and free of prejudicial error.

PROPORTIONALITY REVIEW

Because we have found no error in the guilt and sentencing phases, we are required to review the record and determine: (1) whether the record supports the jury's findings of the aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1983); *State v. Robbins*, 319 N.C. 465, 526, 356 S.E. 2d 279, 315 (1987).

The jury found, as aggravating circumstances, that (1) defendant had been convicted previously of a felony involving the use of violence to the person, and (2) the murder was committed against a deputy sheriff while engaged in the performance of his official duties. N.C.G.S. § 15A-2000(e)(3), (8) (1983). As to the first aggravating circumstance, the State presented uncontroverted documentary evidence establishing that defendant previously had

2. This statute establishes, as an aggravating circumstance which the jury may consider, the following: "The defendant had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3) (1983).

pled guilty to second degree murder and been sentenced to imprisonment of not less than twenty-two nor more than twenty-eight years. As to the second aggravating circumstance, the record contains plenary, uncontroverted evidence that the victim was, at the time of the shooting, a deputy sheriff engaged in the performance of his official duties. The record thus fully supports the jury's findings of the aggravating circumstances upon which the sentencing court based its sentence of death.

We find nothing in the record which suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review.

[22] In conducting proportionality review, we "determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Brown,* 315 N.C. 40, 70, 337 S.E. 2d 808, 829 (1985). We use the "pool" of similar cases announced in *State v. Williams,* 308 N.C. 47, 301 S.E. 2d 335, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied,* 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). *Id.* However, "[w]e do not find it necessary to extrapolate or analyze *in our opinions* all, or any particular number, of the cases in our proportionality pool." *State v. Robbins,* 319 N.C. at 529, 356 S.E. 2d at 316 (emphasis in original).

The crime here was committed against a law enforcement officer while he was engaged in the performance of his official duties. We have noted that this aggravating circumstance, found in N.C.G.S. § 15A-2000(e)(8), reflects the General Assembly's recognition of the "common concern" that "the collective conscience requires the most severe penalty for those who flout our system of law enforcement." *State v. Brown,* 320 N.C. at 230, 358 S.E. 2d at 33.

> The murder of a law enforcement officer *engaged in the performance of his official duties* differs in kind and not merely in degree from other murders. When in the performance of his duties, a law enforcement officer is the representative of the public and a symbol of the rule of law. The murder of a law enforcement officer engaged in the performance of his duties in the truest sense strikes a blow at the entire public—the body politic—and is a direct attack upon the rule

of law which must prevail if our society as we know it is to survive.

*State v. Hill,* 311 N.C. 465, 488, 319 S.E. 2d 163, 177 (1984) (Mitchell, J., dissenting).

Defendant argues that *State v. Hill,* 311 N.C. 465, 319 S.E. 2d 163, where a majority of this Court found the death sentence disproportionate, is the case in the pool most comparable to this one. We disagree. The defendant in *Hill* shot and killed a police officer in a struggle that ensued when the officer tackled the defendant. A significant factor in this Court's holding that the death sentence was disproportionate was "the incredibly short amount of time involved." *State v. Hill,* 311 N.C. at 479, 319 S.E. 2d at 172. *See also State v. Abdullah,* 309 N.C. 63, 306 S.E. 2d 100 (1983), where an officer entered a store while a robbery was in progress, the defendant's response in shooting him was almost instantaneous, and the jury recommended a life sentence. Here, by contrast, the killing followed a considerable period during which law enforcement officers and a neighbor attempted to persuade defendant to stop the shooting, and during which defendant expressly said to the victim: "You leave or I'll kill you."

Further, unlike in the present case, there is no indication in *Hill* or *Abdullah* that the defendants in those cases had been convicted previously of a felony involving violence against the person. We thus conclude that those cases are not sufficiently comparable to the present case to suggest or require a holding that the death sentence here is disproportionate.

Rather, the more comparable case is *State v. Hutchins,* 303 N.C. 321, 279 S.E. 2d 788 (1981). There, "the record clearly establishe[d] a course of conduct on the part of the defendant which amount[ed] to a wanton disregard for the value of human life and for the enforcement of the law by duly appointed authorities." *Id.* at 357, 279 S.E. 2d at 810. We concluded that under such circumstances the sentence of death was not disproportionate or excessive, considering both the crime and the defendant. *Id.* at 357-58, 279 S.E. 2d at 810.

Here, as in *Hutchins,* on the day of the murder defendant engaged in a course of conduct that showed a wanton disregard for the value of human life. His episodic, random shooting—de-

spite several warnings to stop it—threatened all who inhabited, or ventured into, the neighborhood. His ultimate violent act, which followed his own warning to the victim to "leave or I'll kill you," struck at the enforcement of the law by duly appointed authorities.

Thus, as in *Hutchins*, we conclude that nothing about the crime renders defendant's sentence of death disproportionate or excessive.

As to the defendant, the jury found—supported by competent, uncontroverted evidence—that he previously had been convicted of a felony involving the use of violence to the person. N.C.G.S. § 15A-2000(e)(3) (1983). As noted, the record establishes that defendant had pled guilty to second degree murder and had been sentenced to imprisonment of not less than twenty-two nor more than twenty-eight years.[3] Defendant's prior offense thus involved the unlawful killing of another human being with malice, *see State v. Robbins*, 309 N.C. 771, 775, 309 S.E. 2d 188, 190 (1983), and was therefore among the most serious of the many felonies "involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3) (1983).

In *State v. Brown*, we note that the aggravating circumstance provided for in N.C.G.S. § 15A-2000(e)(3) "reflect[s] upon the defendant's character as a recidivist." 320 N.C. at 224, 358 S.E. 2d at 30. The jury in *Brown* found only the "prior violent felony" aggravating circumstance, *id.* at 219, 358 S.E. 2d at 27, whereas the jury here found the additional aggravating circumstance that the offense was committed against a law enforcement officer while he was engaged in the performance of his duties. N.C.G.S. § 15A-2000(e)(8) (1983). Further, the prior violent felony in *Brown* was the discharge of a shotgun into an occupied building—*id.* at 232, 358 S.E. 2d at 34—a considerably less serious offense than second degree murder, the prior violent felony here. We concluded in *Brown* that we could not hold as a matter of law

3. We take judicial notice of our own records—*In re Trucking Co.*, 285 N.C. 552, 557, 206 S.E. 2d 172, 176 (1974); *In re Williamson*, 67 N.C. App. 184, 185, 312 S.E. 2d 239, 240 (1984)—and note that prior to entering his plea of guilty of second degree murder on this charge, defendant had been found guilty of first degree murder and sentenced to death. This Court, however, awarded a new trial for errors in the instructions. *See State v. McKoy*, 236 N.C. 121, 71 S.E. 2d 921 (1952).

State v. McKoy

that the death sentence was disproportionate. *Id.* at 231, 358 S.E. 2d at 34. *A fortiori*, the more serious nature of the total criminal conduct of the defendant here dictates the same conclusion.

We have carefully considered the circumstances of the offense and the character and propensities of the defendant as revealed by the record, briefs, transcript and arguments. We conclude that the facts of this case, combined with defendant's history, support the jury's decision to impose the ultimate penalty of death. We thus hold that the death sentence imposed is not disproportionate within the meaning and intent of N.C.G.S. § 15A-2000(d)(2). Upon this holding the death sentence is affirmed. "This Court has no discretion in determining whether a death sentence should be vacated. *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703; *see Lockett v. Ohio*, 438 U.S. 586, 57 L.Ed. 2d 973." *State v. Robbins*, 319 N.C. at 529, 356 S.E. 2d at 317.

No error.

Chief Justice Exum dissenting.

I join in the dissenting opinions of Justice Martin and Justice Frye. I also dissent from the majority's position that *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988), does not require us to overrule *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983), *overruled in part on other grounds, State v. Shank*, 322 N.C. 243, 367 S.E. 2d 639 (1988); and I write separately in support of my position that *Mills* does require us to overrule *Kirkley* and its progeny.

In *Kirkley* the question arose for the first time in this jurisdiction as to whether a jury in a capital sentencing proceeding must agree unanimously that a mitigating circumstance existed in order to consider that circumstance in the ultimate determination of whether the defendant should live or die. At the sentencing phase of Kirkley's trial the unanimity issue was not addressed in the trial court's initial jury instructions. After some deliberation the jury returned to the courtroom to ask specifically whether it must agree unanimously on each mitigating circumstance before it could continue to consider that circumstance in determining whether to impose death or life imprisonment. The trial court instructed the jury that it must unanimously agree on

each mitigating circumstance before it could continue to consider it in the ultimate balancing process. A majority of this Court in *Kirkley* held, contrary to the position of both the defendant and the state, that there was no error in the trial court's supplemental instructions on the unanimity question, saying, "Certainly consistency and fairness dictate that a jury unanimously find that a mitigating circumstance exists before it may be considered for the purpose of sentencing." *Kirkley*, 308 N.C. at 218, 302 S.E. 2d at 157.

Dissenting on this issue in *Kirkley*, I adopted essentially what was then the state's position. The state in its brief in *Kirkley* said:

> *Lockett v. Ohio*, 438 U.S. 586 [57 L.Ed. 2d 973] (1978), holds that a statute that prevents the sentencer in all capital cases from giving independent weight to aspects in mitigation creates a risk that a death penalty will be imposed in spite of factors which call for a less severe penalty and thus is unconstitutional. It would seem manifestly improper, then, not to permit members of a jury to consider a factor in mitigation simply because all members of the jury were not satisfied with the defendant's showing concerning a particular mitigating circumstance. It would also make any sentencing procedure unmanageable if each time a jury deadlocked on an issue a new sentencing hearing was required.

> It is the State's position that only those mitigating circumstances found unanimously to exist should be listed on the verdict sheet recommended in *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038 [72 L.Ed. 2d 155] (1982). *However, no juror should be precluded from considering anything in mitigation in the ultimate balancing process even if that mitigating factor was not agreed upon unanimously. To do otherwise, the State believes, could run afoul of Lockett v. Ohio, supra.*

*Kirkley*, 308 N.C. at 229, 302 S.E. 2d at 163 (emphasis supplied). I wrote in my *Kirkley* dissent:

> While the state's position on this question might pass constitutional muster, I think the better practice would be to instruct: (1) unanimity is not required in order to answer the

question of the existence of a mitigating circumstance favor-
ably to defendant; (2) such an issue should be answered unfa-
vorably to defendant only if all jurors agreed to so answer it;
(3) such an issue should be answered favorably to defendant
if any juror would so answer it with an indication on the ver-
dict form as to how many jurors so voted; and (4) in the final
balancing process each juror would be free to consider only
those mitigating circumstances which he or she were per-
suaded existed in the case.

*Kirkley*, 308 N.C. at 229-30, 302 S.E. 2d at 163. I still adhere to
this position.

Despite the majority's valiant effort to explain *Mills* away,
the *Mills* holding cannot be reconciled with our *Kirkley* holding
on the unanimity question. Instead the *Mills* holding squarely sus-
tains the position both the state and I took in *Kirkley* on this
issue. Whatever escape from the *Mills* holding might be provided
by differences in Maryland's and North Carolina's capital sentenc-
ing scheme or by the posture in which the *Mills* case reached the
Supreme Court is effectively closed, it seems to me, by the ra-
tionale of the *Mills* decision as expressed in the opinion itself.

The majority correctly identifies the *Mills* holding: Jury in-
structions in a capital sentencing proceeding which create "a
substantial probability that reasonable jurors . . . may well have
thought that they were precluded from considering any mitigat-
ing evidence unless all 12 jurors agreed on the existence of a par-
ticular such circumstance" are constitutionally infirm under the
Supreme Court's Eighth Amendment jurisprudence. *Mills*, 486
U.S. at ---, 100 L.Ed. 2d at 400. Our *Kirkley* holding is precisely
to the contrary and should, therefore, yield.

The majority chooses instead to distinguish *Mills* on the basis
of two circumstances urged upon this Court by the state as legal-
ly material differences.

The first difference suggested is that in Maryland a capital
sentencing jury which finds at least one aggravating circumstance
and fails to find any mitigating circumstances never engages in a
balancing process and must return a sentence of death. In North
Carolina even if one or more aggravating circumstances and no
mitigating circumstances are found, the jury may nevertheless

elect not to impose the death penalty on the basis that the aggravating circumstances are themselves not sufficiently substantial to call for its imposition.

Relying on this difference in the two states' sentencing schemes as justification for continuing our *Kirkley* unanimity requirement ignores the rationale underlying the *Mills* holding as it is explained in the *Mills* opinion. It is true that the Supreme Court in *Mills* was concerned that a single holdout juror in Maryland on mitigating circumstances might force the imposition of the death penalty. The last substantive sentence of the *Mills* opinion is, "[t]he possibility that a single juror could block [consideration of mitigating evidence], and consequently require the jury to impose the death penalty, is one we dare not risk." *Mills*, 486 U.S. at ---, 100 L.Ed. 2d at 400. Indeed, in *Mills* the jury found the one aggravating circumstance submitted, found none of the several mitigating circumstances submitted and on that basis returned a sentence of death.

In Maryland, however, a jury finding one or more aggravating circumstances to exist and one or more mitigating circumstances to exist would then balance the conflicting sets of circumstances by determining whether the mitigating circumstances outweigh the aggravating. In this situation the Maryland sentencing scheme is indistinguishable in principle from North Carolina's.

In North Carolina when both mitigating and aggravating circumstances are found the jury must determine whether the mitigating circumstances are insufficient to outweigh the aggravating. If they are insufficient, then the aggravating circumstances must be considered with the mitigating circumstances and found to be sufficiently substantial to warrant imposition of the death penalty. In both balancing processes only those mitigating circumstances found to exist by all twelve jurors can be considered. Eleven jurors are prevented from considering mitigating circumstances they might wish to consider in these final balancing processes if the one remaining juror refuses to do so. This amounts to contradicting *Mills* by unconstitutionally precluding jurors in North Carolina from considering mitigating circumstances when they ultimately determine whether to impose the death penalty.

The *Mills* rationale as expressed in the opinion leads inescapably to the conclusion that its holding would apply to a Maryland case whether the jury found no mitigating circumstance or at least one but not all the mitigating circumstances submitted to it. Since in this situation Maryland's capital sentencing scheme is no different from North Carolina's, it must follow that the *Mills* holding applies equally to North Carolina's capital sentencing scheme.

The Eighth Amendment jurisprudence upon which *Mills* rests is that in a capital case the sentencing authority may not be precluded from considering any relevant mitigating circumstance which might be proffered by the defendant as reasonably justifying a sentence other than death. *Skipper v. South Carolina,* 476 U.S. 1, 4, 90 L.Ed. 2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 110, 71 L.Ed. 2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 57 L.Ed. 2d 973 (1978). This jurisprudence is summarized at the outset of the substantive discussion in *Mills. Mills,* 486 U.S. at ---, 100 L.Ed. 2d at 393-94. Later in its opinion the Supreme Court posits a Maryland capital sentencing process under which the jury actually reaches the balancing stage, saying:

> Ordinarily, a Maryland jury reaches the balancing stage of the deliberation process any time it unanimously finds at least one mitigating circumstance, or, under the interpretation adopted by the Court of Appeals in this case, any time the jury does not unanimously reject all mitigating circumstances. Had the jurors that sentenced petitioner reached Section III, they would have found that even if they had read the verdict form as the Court of Appeals suggests they could have, and marked "yes" or "no" only on the basis of unanimity as to either, they were not free at this point to consider *all* relevant evidence in mitigation as they balanced aggravating and mitigating circumstances. Section III instructed the jury to weigh only those mitigating circumstances marked "yes" in Section II. Any mitigating circumstance not so marked, even if not unanimously rejected, could not be considered by any juror. A jury following the instructions set out in the verdict form could be "precluded from considering, *as a mitigating factor,* [an] aspect of a defendant's character or record [or] a circumstanc[e] of the offense that the defendant proffer[ed] as a basis for a sentence less than death,"

*Skipper v. South Carolina,* 476 U.S. at 4, 90 L.Ed. 2d 1, 106 S.Ct. 1669, if even a single juror adhered to the view that such a factor should not be so considered.

*Mills,* 486 U.S. at - - -, 100 L.Ed. 2d at 397 (footnote omitted). Footnote 14 presses the point further:

> For example, some jurors in this case might have found that petitioner's age, 20, constituted a mitigating factor, i.e., youthfulness, under § 413(g)(5). Indeed, in his sentencing report the trial judge noted: "There was evidence from which the jury could have found the existence of Mitigating Circumstance No. 5 (youthful age)." App. 108. Other jurors, on the other hand, might have accepted the prosecutor's argument that petitioner was "not youthful in terms of the criminal justice system," id., at 79, because of his history of criminal activity. Under such circumstances, the lack of unanimity would have prevented the jury from marking that answer "yes." Regardless of whether the answer was marked "no" or left blank, the instructions in Section III would prevent those jurors who thought petitioner's youthfulness was relevant to the ultimate sentencing decision from giving that mitigating circumstance any weight.

*Mills,* 486 U.S. at - - -, 100 L.Ed. 2d at 397-98 n.14.

The majority next attempts to distinguish *Mills* on the basis of the posture in which that case reached the Supreme Court. The majority notes that the Maryland Court of Appeals in its *Mills* opinion and the State of Maryland before the United States Supreme Court both conceded that mitigating evidence continued to be legally relevant even if the jury does not unanimously find it to have mitigating value; but in North Carolina such evidence ceases to be legally relevant if rejected by even one juror.

This argument stands *Mills* and the Eighth Amendment jurisprudence upon which it rests on their respective heads. The jurisprudence so far developed by the Supreme Court in a series of cases to which I have already referred is that the Eighth and Fourteenth Amendments preclude a state from creating barriers to the consideration by a capital sentencer of all evidence which may reasonably be said to have mitigating value. It makes no dif-

ference what form these barriers take. The Supreme Court said unequivocally in *Mills*:

> Under our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, *Lockett v. Ohio, supra; Hitchcock v. Dugger*, 481 U.S. ---, 95 L.Ed. 2d 347, 107 S.Ct. 1821 (1987); by the sentencing court, *Eddings v. Oklahoma, supra;* or by an evidentiary ruling, *Skipper v. South Carolina, supra. The same must be true with respect to a single juror's holdout vote against finding the presence of a mitigating circumstance.* Whatever the cause, . . . the conclusion would necessarily be the same: "Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of *Lockett*, it is our duty to remand this case for resentencing." *Eddings v. Oklahoma*, 455 U.S. at 117, n*, 71 L.Ed. 2d 1, 102 S.Ct. 869 (O'Connor, J., concurring).

*Mills*, 486 U.S. at ---, 100 L.Ed. 2d at 394 (emphasis supplied).

"[I]t is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *New Jersey v. T.L.O.*, 469 U.S. 325, 345, 83 L.Ed. 2d 720, 737 (1985), quoting Fed. R. Evid. 401. As noted by Thayer, "The law furnishes no test of relevancy." E. Thayer, *A Preliminary Treatise on Evidence at the Common Law* 265 (1898). The concept of logical relevancy employed in Rule 401 must be kept separate from issues of sufficiency of evidence for any purpose such as to satisfy a burden of production. M. Graham, *Handbook of Federal Evidence* § 401.1 (2d ed. 1986). This concept of relevancy is the same in the context of mitigating evidence in a capital sentencing proceeding as it is in other contexts. Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value. Whether the fact-finder accepts or rejects the evidence has no bearing on the evidence's relevancy. The relevance exists even if the fact-finder fails to be persuaded by that evidence. It is not necessary that the item of evidence alone

convinces the trier of fact or be sufficient to convince the trier of fact of the truth of the proposition for which it is offered. *Id.* at § 401.1 n.12.

To say, as the majority here does, that jury unanimity on a mitigating factor is necessary to make that factor legally relevant in the final balancing process seems not only to be a misuse of the concept of relevancy but also a classical case of circular reasoning with regard to the constitutional question presented. When the Supreme Court speaks in *Mills* of the constitutional necessity for permitting the sentencer in a capital case to "consider" all mitigating evidence in determining whether to impose or not to impose the death penalty, it clearly has reference to that stage of the process where the final sentencing decision is being made. It is at that stage where under *Mills* and its predecessors any juror must not be precluded from considering evidence that juror might reasonably believe to have mitigating value. It is not enough that the juror be permitted to "consider" the mitigating evidence at the point when the jury is trying to determine whether any particular mitigating circumstances exist. There is no question that all jurors were permitted to consider such evidence at that stage of the process in *Mills*.

Rather, the question presented in *Mills* is whether at the ultimate decision-making stage of a capital sentencing proceeding it is constitutionally permissible to preclude any juror from considering a mitigating circumstance that juror believes to exist because not all jurors agree on its existence. *Mills* answers that question "no." It also makes clear that the question must be answered "no" notwithstanding any procedural devices a state may employ to preclude the sentencer's consideration of mitigating factors at the ultimate decision-making stage. This means to me that North Carolina cannot preclude jurors from considering mitigating evidence at that stage by labeling the evidence legally irrelevant.

The majority relies in part on *Franklin v. Lynaugh,* --- U.S. ---, 101 L.Ed. 2d 155 (1988), for the proposition that it is permissible for states to structure, direct and focus the jury's consideration of mitigating evidence. Guiding and structuring the jury's consideration of mitigating evidence is one thing; precluding the jury's consideration of such evidence at the final decision-making

stage is quite another. *Lynaugh* permits the former; *Mills* prohibits the latter. Indeed, the Supreme Court concluded the instructions in *Lynaugh* were not constitutionally infirm "[b]ecause we do not believe that the jury instructions or the Texas Special Issues precluded jury consideration of any relevant mitigating circumstances in this case, or otherwise unconstitutionally limited the jury's discretion . . . ." *Lynaugh*, --- U.S. at ---, 101 L.Ed. 2d at 171.

Because the majority's reliance on the Supreme Court's denial of certiorari in two North Carolina cases in which the *Mills* issue was raised is sparing and properly carries with it the recognition that such denials mean nothing with regard to the Court's views on the merits of the case, I see little need to respond to this aspect of the majority's opinion. Suffice it to say that, according to the authorities cited by the majority, the Supreme Court's position on the issue of the unanimity requirement vis-a-vis mitigating circumstances in a capital sentencing procedure should be determined entirely from its holding and its analysis in *Mills* and not at all from its denials of applications for writs of certiorari in cases in which this issue might have been raised.

Justice FRYE joins in this dissenting opinion.

Justice FRYE dissenting.

Believing that the defendant has not received a fair and impartial trial, I dissent from the majority's decision in both the guilt-innocence and sentencing phases of the trial. First, I am convinced that under the totality of the circumstances, defendant's oral confession was not knowingly and voluntarily made and, for that reason, its admission in evidence against him was error. These circumstances are set out in some detail in the dissenting opinion of Justice Martin in which he concludes that the defendant is entitled to a new trial. I concur in that portion of his opinion.

I also conclude that the defendant is entitled to a new sentencing hearing as stated in the dissenting opinion of the Chief Justice for the reasons stated in his dissenting opinion.

I write separately because I disagree with the majority's treatment of two other issues which bear directly upon the guilt-

innocence phase of the trial and indirectly, if not directly, upon the jury's determination of whether the defendant should receive life imprisonment or the death penalty. My first difference with the majority relates to its treatment of the fact that both the trial court and the prosecutor informed the jury that the trial was subject to appellate review.

Defendant argued that the fact that both the trial court and the district attorney informed the jury that defendant's trial was subject to appellate review constitutes reversible error; that conveying that information to the jury fatally undermined the reliability of the jury's determination that defendant was guilty of murder in the first degree and the jury's conclusion that death was the appropriate punishment. The majority responds by reviewing this Court's decisions in *State v. White*, 286 N.C. 395, 211 S.E. 2d 445 (1975), and *State v. Jones*, 296 N.C. 495, 251 S.E. 2d 425 (1979), and the United States Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320, 86 L.Ed. 2d 231 (1985), concluding that those cases

> stand for the proposition that statements by the trial court or prosecutor that tend to dilute the jury's sense of responsibility for its determinations by suggesting that its verdict will be reviewed, or that the punishment imposed will be withheld, are impermissible and prejudicial. *See* 75 Am. Jur. 2d *Trial* § 230 (1974) ('[c]omments . . . on the power of the court to suspend sentence or to set the jury's verdict aside, or statements that a higher court has the power to review the finding of the jury on the weight of the evidence, are calculated to induce the jury to disregard their responsibility, and are improper.').

The majority then proceeds to distinguish the above cases from the instant case. I find those cases controlling. In *White*, the prosecutor told the jury that "[if] any error is made in this court, [the Supreme] Court will say." *White*, 286 N.C. at 402, 211 S.E. 2d at 449. Here, the prosecutor argued, "[t]here is a right of appeal to any interpretation of laws and application of laws which are present in this case."

Further, in *White* the court stated to the jury that "the Supreme Court will review this case." *Id.* at 402, 211 S.E. 2d at 449. This Court concluded that by that "positive statement . . .

the jury was bound to have understood that the court assumed [that] their verdict would be guilty." *Id.* at 404, 211 S.E. 2d at 450-51. Here, the judge told the jurors that the court reporter

> will be taking down everything that's said or done during the trial so that everything is a matter of public record and then she can type up a transcript of a trial and they mail it down to the Supreme Court and the Supreme Court can review what we're doing up here in Stanly County.

The majority draws a distinction between the use of the words "will review" in *White* and "can review" in the instant case. The distinction, in context, is too fine. As this Court made clear in *White*, a jury in a capital case must weigh the evidence and find the facts on the assumption that whatever verdict they render will be the final disposition of the case. When the judge tells the jurors that the court reporter is taking everything down so that it is a matter of public record, that it will be mailed down to the Supreme Court so that the Supreme Court can review "what we're doing up here in Stanly County," reasonable jurors could easily believe, as stated by this Court, in *State v. Jones*, 296 N.C. 495, 500, 251 S.E. 2d 425, 428, "that the Supreme Court would share with them a burden and responsibility which was in fact their sole responsibility." This belief is further encouraged when the court overrules defendant's objection to the prosecutor's argument that if convicted defendant can appeal on points of law. As Chief Justice Sharp intimated in *White*, jurors may not fully comprehend "the nature of the Supreme Court's review of a case upon appeal and . . . the difference between 'triers of the facts' and judges of the law." *White*, 286 N.C. at 404, 211 S.E. 2d at 450. Here, the trial judge both directly told the jury that its verdict was subject to appellate review and, subsequently, sanctioned the State's comments on that subject by overruling defendant's timely objection. Given those facts and the prior holdings of this Court, defendant's conviction and sentence of death should be vacated and this case remanded for a new trial.

I also disagree with the majority's treatment of defendant's contention that the trial court erred by allowing the prosecutor, during voir dire, to "stake out" the jurors by obtaining commitments from them to disregard defendant's intoxication in determining the existence of premeditation and deliberation and to

reject his voluntary intoxication defense. The purpose of voir dire examination of prospective jurors is to secure an impartial jury. *State v. Banks*, 295 N.C. 399, 245 S.E. 2d 743 (1978). To assure that end, this Court has repeatedly held it improper for counsel to "stake out" jurors during voir dire by posing hypothetical questions designed to elicit in advance what a juror's decision will be under a certain state of evidence or upon a given state of facts. *See, e.g., State v. Rogers*, 316 N.C. 203, 341 S.E. 2d 713 (1986); *State v. Avery*, 315 N.C. 1, 337 S.E. 2d 786 (1985); *State v. Phillips*, 300 N.C. 678, 268 S.E. 2d 452 (1981); *State v. Vinson*, 287 N.C. 326, 215 S.E. 2d 60 (1975), *modified as to death penalty*, 428 U.S. 902, 49 L.Ed. 2d 1206 (1976).

The prosecutor asked the prospective jurors "if it is shown to you from the evidence and beyond a reasonable doubt that the defendant was intoxicated at the time of the alleged shooting, would this cause you in your opinion to have sympathy for him and allow that sympathy to affect your verdict?" The jurors assured the prosecutor that they would not let that fact influence their decision. Further, at the sentencing stage, the prosecutor stated "he was drinking liquor and I told you before you were chosen as a juror that if it is shown that he's intoxicated, were you going to have sympathy, sympathetic to his cause. As I recall, you said you wouldn't."

Allowing the prosecutor to seek and obtain commitments from the jurors was tantamount to asking them to ignore evidence of intoxication in reaching their verdict and in determining the appropriate sentence. The evidence of defendant's intoxication was overwhelming. Deputy Sheriff Lambert went to defendant's home in response to a report that defendant was drunk and firing a shotgun. Deputy Lambert testified that defendant would mumble but he could not understand him and that defendant, though standing, was "wobbly." The emergency room physician testified that defendant had a strong odor of alcohol, did not respond coherently to the doctor's questions, and, notwithstanding a laceration to his skull and a wound to his left buttocks, did not complain of any pain and was not given any medication for pain. Defendant had a blood alcohol level of .264 shortly after the shooting. Dr. Robert Rollins, clinical director of the Dorothea Dix forensic psychiatry unit, included among defendant's diagnoses: "episodic alcohol abuse," "alcohol intoxication, recovered," and

"organic delusional syndrome." In Dr. Rollins' professional opin-
ion, defendant could not distinguish between right and wrong at
the time of the offense and could not have formed the specific in-
tent to kill the officer. In the opinion of Dr. Patricio Lara, another
Dorothea Dix Hospital psychiatrist who also examined defendant,
his intoxication, together with his limited intellectual functioning
and personality disorder, resulted in an impairment of his ability,
at the time of the offense, to conform his conduct with the re-
quirements of the law.

Intoxication, even when voluntary, may constitute a valid
defense to the charge of murder in the first degree. *See, e.g.,*
*State v. Lowery*, 309 N.C. 763, 309 S.E. 2d 232 (1983) (if defendant
was intoxicated to a degree precluding premeditation and deliber-
ation, he cannot be found guilty of murder in the first degree);
*State v. Medley*, 295 N.C. 75, 243 S.E. 2d 374 (1978) (defendant
cannot be convicted of murder in the first degree if intoxicated to
a degree sufficient to preclude forming a specific intent to kill).

This Court has held that "[a] juror who reveals that he is
unable to accept a particular defense or penalty recognized by
law is prejudiced to such an extent that he can no longer be con-
sidered competent." *State v. Leonard*, 296 N.C. 58, 62-63, 248 S.E.
2d 853, 855 (1978). Thus, permitting defendant to be tried for his
life by a jury whose members had expressly committed them-
selves to disregard what proved to be substantial evidence that
defendant was highly intoxicated at the time the fatal shot was
fired infringed upon his fundamental right to be tried by an im-
partial jury.

As stated by the Supreme Court of Mississippi in *Stringer v.
State*, 500 So. 2d 929 (1986):

It is improper influence to put the jury in a 'box' by *voir dire*
tactics which extract a promise, prior to trial, to ignore
evidence favorable to the defendant. This promise or pledge
prevents the jurors from considering all facts relevant to the
verdict. The jurors are then called upon during closing argu-
ments to fulfill that promise, and the effect—whether calcu-
lated or not—is to shame or coerce the jury into rejecting
factors which would tend to mitigate against the death penal-
ty.

*Id.*, 500 So. 2d at 936-37.

For all of the reasons indicated herein, and for the reasons set forth in the dissenting opinion of Justice Martin, defendant should be given a new trial. Even if his conviction is upheld, he should be given a new sentencing hearing for the reasons stated in the dissenting opinion of the Chief Justice.

## PROPORTIONALITY

Because I do not believe that defendant has received a fair trial free of prejudicial error, I would not reach the question of proportionality. However, since the majority reaches that question and finds that the death sentence is not disproportionate in this case, I write to express my disagreement with that conclusion also.

As the majority correctly states, in conducting proportionality review, we "determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Brown,* 315 N.C. 40, 70, 337 S.E. 2d 808, 829 (1985). There are four cases in the proportionality pool in which defendants killed law enforcement officers engaged in the performance of their official duties. Those cases are: *State v. Payne,* 312 N.C. 647, 325 S.E. 2d 205 (1985), *State v. Hill,* 311 N.C. 465, 319 S.E. 2d 163 (1984); *State v. Abdullah,* 309 N.C. 63, 306 S.E. 2d 100 (1983), and *State v. Hutchins,* 303 N.C. 321, 279 S.E. 2d 788 (1981).

In *Payne,* defendant murdered a detective who had earlier arrested him on a drug charge. He handcuffed the detective's hands behind his back and pushed him into a river to drown. The jury returned a verdict of life imprisonment. In *Hill,* a policeman chased and tackled the defendant who was suspected of having committed a felony. During the ensuing struggle, defendant managed to get possession of the officer's pistol and shot and killed him. This Court found the death sentence disproportionate and sentenced defendant to life imprisonment. In *Abdullah,* defendant conspired with others to commit an armed robbery and shot the policeman several times during the course of the robbery, killing him. The jury returned a verdict of life imprisonment. In *Hutchins,* the defendant shot and killed two officers and then shot and killed a third officer who was attempting to arrest him. This Court upheld the sentence of death.

When considering the crime and the defendant and comparing this case with the crime and the defendants in the other four cases involving the killing of law enforcement officers, I find the instant case more like *Abdullah, Hill,* and *Payne* than *Hutchins.* Thus, I agree with defendant that to conclude that he deserves to die, when the defendants in *Abdullah, Payne,* and *Hill* were spared that ultimate penalty, would defeat the purpose of proportionality review mandated by the legislature, which, as this Court stated in *State v. Jackson,* 309 N.C. 26, 46, 305 S.E. 2d 703, 717 (1983), "is to serve as a check against the capricious or random imposition of the death penalty." Thus, were I to reach proportionality, I would find the death sentence in the instant case disproportionate as a matter of law and sentence defendant to life imprisonment.

Chief Justice EXUM joins in this dissenting opinion.

Justice MARTIN dissenting in part.

I respectfully dissent from the holding of the majority that defendant's inculpatory statements were admissible; otherwise, I concur in the majority opinion, including specifically, the resolution of the issue arising under *Mills v. Maryland,* 486 U.S. ---, 100 L.Ed. 2d 384 (1988).

With respect to the confession issue, the majority approves the admission of inculpatory statements by a sixty-five-year-old black man with an I.Q. of 74, blind in one eye, his other eye injured and bandaged so that he could not see, wounded and treated at the hospital, with a blood alcohol level of .264, afraid for his life, travelling in a van with officers for over two hours from Anson County to Raleigh, at times cold and thirsty, suffering from his wounds, and being, in the opinion of Dr. Rollins, incapable of appreciating the waiver of his constitutional rights. In this I cannot concur.

Perhaps by finecombing the record, as the majority has done, some evidence can be found which when isolated may support some of the trial court's findings of fact. The true test of the voluntariness of a confession, though, is found in the totality of the circumstances. *State v. Jackson,* 308 N.C. 549, 304 S.E. 2d 134 (1983). Once it is established that the procedural requirements of

*Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966), have been met, the determination of whether defendant's confession was knowingly and voluntarily made must be found from considering all of the circumstances of the case. *State v. Corley*, 310 N.C. 40, 311 S.E. 2d 540 (1984).

What were the totality of the circumstances when defendant confessed?

### The Environment

First, it is to be noted that defendant was in a sheriff's van, being transported to Raleigh "for safekeeping" without the issuance of a judicial order authorizing the transfer. N.C.G.S. § 15A-521 (1983). Although an officer testified that "warrants" were served on defendant while in the van, no warrants appear in the record on appeal. The crime occurred and defendant was taken to Raleigh on 22 December 1984. The order of arrest in the record on appeal was served on defendant on 24 January 1985. So we have a defendant being unlawfully transported in a van through the black of night by hostile officers, alone, with no way to contact anyone outside the van as a witness or otherwise.

The trial court failed to consider the actions of the officers in removing defendant from the hospital and interrogating him in the isolated and coercive environment of a moving police van. Compelling a suspect to travel during interrogation, or interrogating a suspect during travel, is a factor which suggests involuntariness. *Clewis v. Texas*, 386 U.S. 707, 18 L.Ed. 2d 423 (1967). Here, the defendant was completely incommunicado and isolated from the police station or the jail. This was obviously done for the purpose of interrogating the defendant in an environment conducive to producing inculpatory statements. These are factors indicating involuntariness. This is particularly true when the defendant is susceptible to coercion. *Vernon v. Alabama*, 313 U.S. 547, 85 L.Ed. 1513 (1941) (per curiam); *White v. Texas*, 310 U.S. 530, 84 L.Ed. 1342 (1940). The officers were fully aware that the defendant had been badly wounded by gunfire shortly before the interrogation. They knew that defendant had been extremely intoxicated when he was brought to the hospital. They knew he was blind and in a severely weakened physical condition. Having this knowledge, the officers took the defendant from the hospital on a gurney, placed him into a police van containing three of-

ficers, and commenced the nighttime ride from Wadesboro to Raleigh. In so doing, the officers deliberately cut defendant off from the outside world, leaving him in a position of extreme vulnerability to their interrogation. It is difficult to conceive of a fact situation more conducive to overbearing a defendant's will than the one existing in this case.

## THE DEFENDANT

The defendant at the time of this offense was sixty-five years of age. He was suffering from serious gunshot wounds sustained in the preceding hours. He was blind, mentally disordered, had a borderline intellect, and was under the influence of alcohol. He expressed to the officers that he was afraid for his life at the time they were interrogating him in the police van. Dr. Perry, an emergency room physician, testified that defendant was brought to the hospital by ambulance around 6:30 p.m. Dr. Perry treated him in the trauma facility for two serious gunshot wounds, one a laceration through the forehead down to the skull, the other a puncture wound to the buttocks. The head wound was about six centimeters long and very deep, the bullet passing through the entire thickness of the forehead down to the skull. The wound to the buttocks was a through-and-through injury, about ten to twelve centimeters in length. Defendant was semiconscious at the time of his arrival and unable to respond coherently to the doctor's attempts to communicate with him. Such wounds are normally very painful, but defendant did not indicate that he was suffering the normal degree of pain, which the doctor attributed to the degree of defendant's alcoholic intoxication, which was a blood alcohol level of .264. Dr. Perry treated defendant's wounds for some forty minutes, closing them with sutures. They were heavily bandaged, completely closing the defendant's good eye, he being blind in the other eye. During the treatment defendant was administered intravenous fluids for the purpose of elevating his blood pressure, according to Dr. Perry.

Dr. Rollins is an expert medical witness, a forensic psychiatrist, and employed by the state. He examined the defendant several times with respect to this incident. He testified that defendant had multiple personality disorders, including paranoid and delusional thinking, with impaired judgment and perception. In 1980 he had scored 89 on an I.Q. examination, but later, at the

time of this event, his I.Q. test score had deteriorated to 74, which placed defendant in the borderline range of intellectual functioning. Dr. Rollins further testified that defendant was substantially intoxicated at the time of the interrogation and that this condition would exacerbate defendant's mental disabilities. He expressly testified that defendant, because of his mental disorders and his physical condition at the time, was incapable of knowingly and voluntarily waiving his constitutional rights at the time that he was interrogated by the officers.

The trial judge failed to make any findings as to the defendant's mental condition and completely overlooked the deteriorating mental and psychotic condition of the defendant which had occurred over the past five years as evidenced by the decline in his I.Q. scores. The court's determination that defendant had an I.Q. at the time of the interrogation between 74 and 89 is unsupported by the evidence. The only relevant evidence indicates that at the time of the interrogation defendant's I.Q. was 74, having deteriorated from the 89 that he had scored some five years previously. Mental handicaps which make a defendant particularly susceptible to the influence of others are an important factor in weighing voluntariness. *Jurek v. Estelle*, 593 F. 2d 672 (5th Cir. 1979). Further, a defendant's physical condition is an important factor in determining whether a confession is voluntary. *Cooper v. Griffin*, 455 F. 2d 1142 (5th Cir. 1972). *See also State v. Dailey*, 351 S.E. 2d 431 (W. Va. 1986).

In *Colorado v. Connelly*, 479 U.S. ---, 93 L.Ed. 2d 473 (1986), the United States Supreme Court held that ordinarily a defendant's mental impairment, standing alone, is not a sufficient basis for ruling a confession involuntary. However, in this case, we have not only the defective mental condition of the defendant, but also the coercive environment in which the officers placed the defendant, together with his impaired physical condition. These factors considered together are sufficient to show involuntariness.

THE INTERROGATION

After placing the defendant in the police van and beginning the journey to Raleigh, the officers informed the defendant of his rights as they were leaving the Wadesboro city limits. To this the defendant responded: "I was tried for my life and I understand all this stuff. I was tried for my life back in 1951." Interestingly,

*Miranda* warnings were not required until 1966, fifteen years *after* defendant's earlier court experience. The officers testified that after being read his rights defendant said "[h]e did understand but he did not want to sign anything because he couldn't see." From this testimony, the trial court found that the defendant made an "express" statement that he did not want an attorney present. A fair reading of this testimony, however, only shows that the defendant responded that he understood his rights, but he did not want to sign anything because he could not see. There is no indication in this testimony that the defendant expressly waived the presence of counsel. He did not go the additional step and say: "I don't want a lawyer now." Of course, it is not essential that there be an express waiver by defendant. However, the court must presume that the defendant did not waive his rights. *State v. Connley,* 297 N.C. 584, 256 S.E. 2d 234, *cert. denied,* 444 U.S. 954, 62 L.Ed. 2d 327 (1979). The trial court's finding of an express waiver is unsupported by the evidence. Nowhere does the trial court find an implied waiver under all the circumstances of the case, and none can be so found. For this reason, I think the trial judge's order is fatally flawed.

The interrogation continued for some two hours, and during this time the officers obtained admissions from defendant that proved to be critical to the state's case. During the interrogation, the defendant stated, "I'm fearing for my life now." Although the officers testified that they assured defendant that he had nothing to fear, the defendant could not see the officers and had no way of knowing what they were doing in the van. He also had no way of knowing where they were taking him, even though one officer said he was being taken to Raleigh for safekeeping. Certainly, in view of the environment in which he was situated and his physical and mental condition, it is reasonable that the defendant was fearful for his life at the time that he was being interrogated. That fact alone is sufficient to refute any finding of voluntariness.

During the interrogation the defendant was suffering from his painful bullet wounds. There is no evidence that he had been given any sedatives or painkillers to alleviate his suffering. The record shows that defendant voiced numerous complaints during the interrogation and that he was experiencing physical discomfort.

At one point defendant told the officers that he was tired and wanted to stop the interrogation. He also complained at that time that he was cold, and the heat in the van was turned up and he was given a sheet to cover himself. After a short period, one of the officers asked defendant if he wanted to talk. Defendant stated that he did not want to talk to Officer Jackson. One of the other officers asked defendant if he would talk with him, and defendant agreed. This procedure by the officers violates the ruling of *Edwards v. Arizona,* 451 U.S. 477, 68 L.Ed. 2d 378, *reh'g denied,* 452 U.S. 973, 69 L.Ed. 2d 984 (1981). In *Edwards,* the Court held that when a suspect indicates his desire to stop the interrogation, the officers must terminate it and the interrogation cannot be resumed until initiated by the suspect. Here, the evidence clearly shows that defendant desired to terminate the interrogation. He said that he was tired and wanted to stop. The officers stopped for a short time and then, without any initiation of the interrogation by the defendant, the officers resumed the process of examining the defendant. For this reason, the confession was not admissible.

Thus, I find defendant's statement to be involuntary and the result of his being unlawfully placed in a coercive environment while severely handicapped, both mentally and physically, and interrogated in violation of *Edwards v. Arizona* while fearful for his life. Defendant is entitled to a new trial.

Chief Justice EXUM and Justice FRYE join in this dissenting opinion.